## Jones *versus* Commonwealth.

75  403
198  61

1. The wife of the defendant having improper relations with another, he fell into habits of drunkenness, quarrelled with his wife, took laudanum and remained under its effects; he continued to drink immoderately and was in a constant state of nervous excitement. Having a pistol he went to the house of his wife's mother, where his wife was, he having previously threatened to shoot her; the mother picked up a stool and said she would level him; he replied he would level her, pulled out the pistol and shot and killed the mother. *Held*, under all the circumstances to be murder, but of the second degree.

2. In the court below the defendant, indicted for murder, pleaded "Guilty," the court heard the testimony and decided that it was of the *first* degree. On writ of error under the Act of February 15th 1870, the Supreme Court reviewed the law and the evidence and determined the degree of the murder.

3. Intoxication is not an excuse for crime, but if it deprives the intellect of power to think and weigh the nature of the act, it may prevent a conviction of murder in the first degree.

4. The intent to take life with a full and conscious knowledge of the purpose to do so is the distinguishing criterion of murder in the first degree; the words "deliberately and premeditatedly" define this.

March 10th 1874.   Before AGNEW, C. J., SHARSWOOD, MERCUR and GORDON, JJ.   WILLIAMS, J., at Nisi Prius.

Error to the Court of Oyer and Terminer of *Luzerne county:* To July Term 1873.

At the September Term 1872 of the Court of Oyer and Terminer of Luzerne county, William S. Jones was indicted for the murder of Frances Hughes. He pleaded "Not guilty," and was tried at the same term. On the 27th of September 1872 the jury found a verdict of guilty of murder in the first degree.

The court having awarded a rule to show cause why a new trial should not be granted, afterwards made the rule absolute and granted a new trial.

On the 23d of January 1873 the prisoner withdrew the plea of "Not guilty" and pleaded "Guilty."

On the 31st of January 1873, the court (Dana, J., and the associates) proceeded by examination of witnesses to determine the degree of the crime: Act of March 31st 1860, sect. 74, Pamph. L. 402, 1 Br. Purd. 338, pl. 120. The substance of the testimony is stated by Chief Justice Agnew, delivering the opinion of the Supreme Court.

On the conclusion of the hearing, the defendant requested the court to give an opinion upon the following points in writing and file the same with the record of the case, together with the testimony upon which the finding of the court is based:—

1. Whether the defendant can be adjudged guilty of murder in the first degree unless the evidence clearly and beyond a reasonable doubt establishes that the killing was premeditated, wilful and deliberate, and perpetrated by him when of sound mind, memory and discretion and capable of forming a specific intent to take the life of the deceased.

[Jones *v.* Commonwealth.]

2. Whether as matter of law the evidence in the case is sufficient to base a finding of murder in the first degree.

3. Whether the state of the defendant's mind and body, as shown by the undisputed testimony, were not such as to preclude the possibility of his having formed a deliberate, wilful, premeditated and specific intent to take the life of the deceased.

4. Whether an intent and preparation to take the life of his wife, if proved, can be made to relate to the crime with which he is charged.

5. Whether an entire absence of motive on the part of the prisoner ought not, in the absence of conclusive proof of a premeditated killing, to raise a reasonable doubt in his behalf.

In his opinion, Judge Dana, after recapitulating the evidence, said : * * *  " Under all the evidence we are brought to the conclusion that the shot was fired with intent to kill the deceased.

" In answer to the fourth question presented by counsel for the defence, whether an intention and preparation to take the life of his wife, if proved, can be made to relate to the crime with which he is charged, we reply, that an intention and preparation to take the life of his wife, followed by his killing of the deceased, do not necessarily constitute murder in the first degree.  Under the evidence they are connected with, and to that extent relate to, the crime with which he is charged; but our conclusion, reluctantly reached under all the evidence, is that the fatal shot was fired, not with intent to kill the wife, but to kill the deceased, and that such killing was wilful, deliberate and premeditated.

" In answer to the fifth inquiry presented by the defence, we reply that the fact of an entire absence of motive for the act on the part of the prisoner, which is assumed in the question, is not warranted under the evidence.   The absence of conclusive proof of a premeditated killing, with the absence of a motive for the act, ought certainly to raise a reasonable doubt in the prisoner's behalf. But in view of his previous threats ; of his declaration after the act ; the refusal of the deceased, on the morning of that day, to return his clothing upon request; his previous relations with his wife and with her mother, the deceased; the occurrence at three o'clock of that afternoon ; the ill feeling renewed in the minds of both the deceased and the accused ; the altercation at and immediately before the act, we cannot say there was entire absence of motive, but that, on the contrary, the whole evidence discloses the existence of a motive inducing to the act.

" To the first question put to us by the counsel for the defence, we answer that the prisoner cannot be adjudged guilty of murder of the first degree, unless the evidence, clearly and beyond a reasonable doubt, establishes that the killing was premeditated, wilful and deliberate, and perpetrated by him when of sound mind, memory and discretion and capable of forming a specific intent to take the life of the deceased.

[Jones *v.* Commonwealth.]

" We have already expressed our view in the foregoing that the evidence does establish a killing which constitutes murder of the first degree, and we answer the second question in the affirmative, that, in our opinion, ' as matter of law, the evidence in the case is sufficient to base a finding of murder in the first degree.'

" We have already answered the third question proposed in the negative, and expressed our conclusion upon all the evidence, that the prisoner's condition of mind and body was ' not such as to preclude the possibility of his having formed a deliberate, wilful, premeditated and specific intent to take the life of the deceased.' We have reached these conclusions upon careful consideration of all the evidence, with that caution which the irretrievable result is calculated to inspire. Brief notes of the testimony have been taken; we have given a summary of our conclusions and our answers to the several questions submitted to us, to facilitate their revision, if we have fallen into error.

" Upon all the evidence and circumstances of the case, elicited by examination of the witnesses, as directed by the Act of Assembly, we determine the degree of the crime of which the prisoner is convicted by confession to be that of murder of the first degree."

The defendant removed the record to the Supreme Court by writ of error, and under the Act of February 15th 1870, Pamph. L. 15, 1 Br. Purd. 610, pl. 39, assigned for error that—

" The court erred in finding the prisoner guilty of murder in the first degree, such a finding being unwarranted by the evidence."

*H. W. Palmer* and *Woodward*, for plaintiff in error.—Whoever is convicted of murder in the first degree should be found to have. acted upon as clear and premeditated a motive as he who kills by poison or by lying in wait. A maniac or an idiot cannot commit murder in the first degree, because he is incapable of the premeditation which the statute requires. And such is the rule in regard to drunkenness. While it is no palliative or excuse for crime, because it is itself a crime, yet it may show want of malice and design; and if it be satisfactorily established, it may lower the grade of homicide from murder in the first degree to murder in the second degree: McFall's Case, Addison 257; Lewis on Crim. Law 405; Wharton's Am. Crim. Law 93. The rule therefore seems to be, that while drunkenness is no defence or palliation, its existence may be shown to rebut the presumption of malice or to grade the intention: Cases cited in American Criminal Law 83; 1 Archbold's Criminal Evidence 4; Rex *v.* Grindley, cited in 1 Russell on Crimes 8; Rex *v.* Thomas, 7 C. & P. 851; Warren *v.* Commonwealth, 1 Wright 47; Kelly *v.* Commonwealth, 1 Grant 492.

[Jones *v.* Commonwealth.]

There was no paper-book or appearance for the Commonwealth.

The opinion of the court was delivered, March 23d 1874, by

AGNEW, C. J.—In this case, if we confine our attention to the weapon, its previous preparation, the threat proved by Mr. Crooks, the time for deliberation, and the circumstances of the killing of Mrs. Hughes by the prisoner, we might conclude that his crime was murder in the first degree. In this aspect the learned judge of the Oyer and Terminer had sufficient evidence to justify his finding of the degree. But ample time for reflection may exist, and a prisoner may seem to act in his right mind, and from a conscious purpose; and yet causes may affect his intellect, preventing reflection, and hurrying onward his unhinged mind to rash and inconsiderate resolutions, incompatible with the deliberation and premeditation defining murder in the first degree. When the evidence convinces us of the inability of the prisoner to think, reflect and weigh the nature of his act, we must hesitate before we pronounce upon the degree of his offence. That reasonable doubt which intervenes to prevent a fair and honest mind from being satisfied that a deliberate and premeditated purpose to take life existed, should throw its weight into the scale to forbid the sentence of death. Intoxication is no excuse for crime; yet when it so clouds the intellect as to deprive it of the power to think and weigh the nature of the act committed, it may prevent a conviction of murder in the first degree. The intent to take life, with a full and conscious knowledge of the purpose to do so, is the distinguishing criterion of murder in the first degree; and this consciousness of the purpose of the heart is defined by the words deliberately and premeditatedly. Much has been said upon the meaning of these words, some of which may mislead, if we do not consider well the cases in which it has been uttered. In The Commonwealth *v.* O'Hara, tried in 1797, Chief Justice McKean said: "What is the meaning of the words deliberately and premeditatedly? The first implies some degree of reflection. The party must have time to frame the design. The time was very short—it cannot be said to be done coolly. The legislature must have put a different construction on the words deliberately and premeditatedly. If he had time to think, then he had time to think he would kill. If you are of opinion he did it deliberately, with intention to kill, it is murder in the first degree. If he had time to think, and did intend to kill, for a minute as well as an hour or a day, it is sufficient." The correctness of this charge to the jury will not be doubted, if we examine the circumstances, and yet this is essential to understand it properly. O'Hara was a journeyman shoemaker, sitting on his bench at work with Haskins and others. Aitkins, the deceased, his friend, came up stairs, and said to him: "I have been talking about you below this hour." "Yes," said Haskins,

[Jones v. Commonwealth.]

"about the five sheep you stole." Thereupon O'Hara *immediately* left his work upon the bench, took up a shoemaker's knife by his side, went up to Aitkins, and stabbed him in the belly. The act was not thoughtless, for the prisoner had time to lay down his work, take up the knife, rise and walk up to his friend, and to strike him in a vital part with an instrument of death. Upon every principle of human action, we must conclude, under these circumstances, that O'Hara intended to take Aitkins's life, otherwise the thoughts of men never can be determined from clear and distinct acts evidencing the purpose of the mind. There was irritation, it is true, heightened by the previously existing story about the sheep; but it was without any just cause of provocation to take life, and, therefore, evidenced a heart malignant, and ready to execute vengeance even upon a friend, in a moment of wicked passion. In such a case, a moment was sufficient to form and deliberate upon the purpose to take life, and premeditate the means of executing it. But these words of the Chief Justice are sometimes wrested from their application and applied to cases where reason has been torn up by the roots, and judgment jostled from her throne.

Another case often quoted and misapplied, is that of Richard Smith, tried before President Rush, in 1816. Smith had become intimate with the wife of Captain Carson, and had a difficulty with him in his own house. He returned with Mrs. Carson, and went with her up into the parlor. Carson came up unarmed, and ordered him to leave. Smith had armed himself, and held one hand under his surtout, and the other in his breast. Carson told Smith he had come to take peaceable possession of his own house, and the latter must go. Smith said to Mrs. Carson, "Ann, shall I go?" She replied "No." Smith moved into the corner of the room, Carson following him, and telling him he must go, at the same time letting his arms fall by his side, and saying he had no weapon. Upon this, Smith drew a pistol from under his surtout, and shot Carson through the head, threw down his pistol, and ran down stairs. In this state of the facts, Judge Rush, charging upon the subject of deliberation, said: "The truth is, in the nature of the thing, no time is fixed by the law, or can be fixed for the deliberation required to constitute the crime of murder." Speaking, then, of premeditation, he says: "It is equally true, both in fact and from experience, that no time is too short for a wicked man to frame in his mind the scheme of murder, and to contrive the means of accomplishing it." We cannot doubt the correctness of these remarks in the case in which they were made, but cases often arise where this readiness of intent to take life, when imputed, may do great injustice. Hence it was said in Drum's case, 8 P. F. Smith 16: "This expression (of Judge Rush) must be qualified, lest it mislead. It is true that such is the swiftness of human thought, no time is so short in which

[Jones *v.* Commonwealth.]

a wicked man may not form a design to kill, and frame the means of executing his purpose; yet this suddenness is opposed to premeditation, and a jury must be well convinced upon the evidence that there was time to deliberate and premeditate. The law regards, and the jury must find the actual intent, that is to say, the fully formed purpose to kill, with so much time for deliberation and premeditation, as to convince them that this purpose is not the immediate offspring of rashness and impetuous temper, and that the mind has become fully conscious of its own design. If there be time to frame in the mind fully and consciously the intention to kill, and to select the weapon or means of death, and to think and know beforehand, though the time be short, the use to be made of it, then there is time to deliberate and premeditate." This was said in the case of a sudden affray, where the circum-. stances made it a serious question whether the act was premeditated, or was the result of sudden and rash resentment.

Thus we must perceive, that at the bottom of all that has been said on the subject of murder in the first degree, is the frame of mind in which the deadly blow is given—that state of mind which enables the prisoner either to know and be fully conscious of his own purpose and act, or not to know. Why is insanity a defence to homicide? Because it is a condition of the mind which renders it incapable of reasoning and judging correctly of its own impulses, and of determining whether the impulse should be followed or resisted. Intelligence is not the only criterion, for it often exists in the madman in a high degree, making him shrewd, watchful and capable of determining his purpose, and selecting the means of its accomplishment. Want of intelligence, therefore, is not the only defect to moderate the degree of offence; but with intelligence there may be an absence of power to determine properly the true nature and character of the act, its effect upon the subject, and the true responsibility of the actor; a power necessary to control the impulses of the mind, and prevent the execution of the thought which possesses it. In other words, it is the absence of that self-determining power, which in a sane mind renders it conscious of the real nature of its own purposes, and capable of resisting wrong impulses. When this self-governing power is wanting, whether it is caused by insanity, gross intoxication, or other controlling influence, it cannot be said truthfully that the mind is fully conscious of its own purposes, and deliberates or premeditates in the sense of the act describing murder in the first degree. We must, however, distinguish this defective frame of mind from that wickedness of heart which drives the murderer on to the commission of his crime, reckless of consequences. Evil passions do often seem to tear up reason by the root, and urge on to murder with heedless rage. But they are the outpourings of a wicked nature, not of an unsound or disabled mind. It becomes necessary, therefore, to inquire upon the evi-

[Jones v. Commonwealth.]

dence in this case, whether the prisoner was really able to deliberate and premeditate the homicide.

William S. Jones had been upon bad terms with his wife. She had become too intimate with another Jones, called Charley. William S. Jones failing to break off the association got to drinking hard, and, finally after another quarrel with his wife on the 10th of June 1871, attempted suicide by taking a large quantity of laudanum. Dr. Davis found him lying on a lounge partly insensible, eyes nearly closed, pupils contracted, and face discolored by congestion. Energetic remedies were used, and he was so far restored as to be out of danger, but the effects of the laudanum remained. From this time until the night of the 19th of June, when he took the life of Mrs. Hughes, his mother-in-law, he was in a constant state of nervous excitement, continued drinking, and had bottles of laudanum about his person. Many witnesses describe him as without sense, constantly talking nonsense, wild in appearance, and incoherent in speech. Some say he acted like a man drinking hard, was intoxicated, and once fell from a horse. Others described him as looking crazy, talking to himself, his hands going, his head thrown back, walking to and fro, throwing his head about, swinging his arms, and wild, nervous and excited. He would jump upon a chair and begin to preach, and run off upon Charley Jones and his wife; said he was going to build a tavern on the mountain, and a church beside it; claimed all the property about, and was evidently much out of the way. These appearances were particularly noticed on the 19th day of June, the day of the homicide. He was then on very bad terms with his wife, yet seeking her and remonstrating with her, and on the afternoon of that day he had beaten and abused her, chasing her down stairs and into the street, and there striking and kicking her until separated by others. He continued in this condition down into the night of the 19th, when he came to Mrs. Hughes's house, between nine and ten o'clock. Stepping inside of the door, he asked Mrs. Hughes if the fuss was settled; said he had come down to settle it. She rose and told him to go away; told Lizzie to fetch a poker; said she would strike him, if he did not go away. He stepped back. She picked up a stool, and told him if he did not go away she would level him with it. He said, "I'll level you now," pulled out a pistol, stepped forward and shot her. Mrs. Hughes twice exclaimed, "I am shot," and went back into the kitchen, while Jones was seized by the persons present, and the pistol wrested from his hand. Between him and Mrs. Hughes there had been a state of good feeling, before he took the laudanum, and she attended him upon the day when he was under its influence. He spoke of her as his best friend. His conduct towards his wife, her daughter, had led Mrs. Hughes to resent it, and some feeling had arisen on the part of Jones, but after his arrest, he said he took the pistol to kill his wife, and the old woman had got it.

[Jones *v.* Commonwealth.]

Looking then at the state of Jones's mind from the 10th until the 19th of June, and down to the very moment he fired the pistol, and, also, at the suddenness of his quarrel with Mrs. Hughes, her call for the poker, and lifting the stool, it seems to us a matter of grave doubt whether his frame of mind was such that he was capable either of deliberation or premeditation. It appears to have been rather the sudden impulse of a disordered brain, weakened by potations of laudanum and spirits, and of a distorted mind, led away from reason and judgment by dwelling upon the conduct of his wife, influenced by his continued state of excitement. It presents a case of the preparation of a weapon, and an undefined purpose of violence to some one, where the time for reflection was ample; but where the frame of mind was wanting, which would enable the prisoner to be fully conscious of his purpose, or to resolve to take the life of the deceased, with deliberation and premeditation. Yet it was clearly murder, done without sufficient provocation and without necessity, and in a frame of mind evincing recklessness and that common-law malice, which distinguishes murder from manslaughter. There was error, therefore, in ascertaining the degree, and sentencing to death.

The judgment of the Court of Oyer and Terminer of Luzerne county is reversed, and this court proceeding now to determine, upon the same evidence, the degree of the crime whereof the said William S. Jones is convicted by his own confession, now finds and declares that the crime of the said William S. Jones is murder in the second degree, and gives judgment accordingly; and forasmuch as the said William S. Jones is confined in the public jail of Luzerne county, distant herefrom, it is further ordered that the record, together with this finding and judgment, be remitted to the said Court of Oyer and Terminer of Luzerne county, with a direction to the judges thereof to proceed to pronounce sentence upon the said William S. Jones, as for murder in the second degree, according to law, and for such term of imprisonment at labor, as they, the said judges, shall adjudge to be a fit and proper punishment for his said offence.