JOHN A. STANTON v. STATE OF FLORIDA
5 So. (2nd) 4
En Banc
Opinion Filed December 9, 1941

J. H. *Swink,* for Appellant;

J. *Tom Watson,* Attorney General, *Joseph E. Gillen,* Assistant Attorney General, and *Woodrow M. Melvin,* Special Assistant Attorney General, for Appellee.

ADAMS, J.—This appeal is from a conviction of murder in the first degree without recommendation.

The defense was not guilty on the ground of insanity. We are asked to determine: first, whether the evidence is sufficient; and second, whether the verdict was concurred in by all twelve jurors.

The trial judge proceeded acording to Section 203 of the Criminal Procedure Act of 1939, determined the defendant was sane and ordered him to stand trial. In this ruling we find no abuse of discretion.

The evidence before the jury disclosed that defendant, a man of about fifty years of age and one Taylor, about twenty-two years of age planned a robbery. Rubber gloves, screw driver, handkerchief for a mask and a crow bar were procured by defendant. The two of them late at night, broke and entered a building where deceased was sleeping. They entered the room where deceased was asleep. Taylor held a flashlight on deceased while defendant commanded him to turn over and be tied up. At that time deceased asked how they had gotten in his place and started to raise up whereupon defendant struck him several fatal blows over the head with the crow bar, turned him over, tied and gagged him. Defendant and Taylor then robbed the place and departed to a distant city. Deceased was found later in the morning in the same condition, dead.

Medical testimony with defendant's history depicted him as a shrewd, calculating, selfish, egotistical and domineering individual with criminal inclinations so strong that he was callous to all law and morality. This is severe language, however every adjective is sustained by the medical testimony introduced by defendant. The defendant did not testify. His case history referred to by his medical experts showed that at times he experienced hallucinations, imagining he heard voices commanding him to do certain things. He often disobeyed them.

There was no pretense that he committed this crime under any hallucination. He claimed the deceased had cheated him of some trivial sum and he was therefore justified in the robbery; that when deceased resisted being tied up he was justified in the assault. The gist of the medical opinion is that defendant

knew at all times the nature of his offense and also the penalty for same; that he knew right from wrong; that he was and is now conscious of his deed and the probable punishment.

Insanity being a legal rather than a medical term, we must consider the medical testimony by our own definition of insanity rather than by the medical terminology. We have said in Davis v. The State of Florida, 44 Fla. 32, 32 So. 822:

"If the accused was conscious that the act was one which he ought not to do, and if that act was at the same time contrary to the law of the land, he is punishable; and the usual course, therefore, has been to leave the question to the jury, whether the party accused had a sufficient degree of reason to know that he was doing an act that was wrong."

We are not without sympathy for the medical suggestion in the record that the law should not take its course because of defendant's abnormal mental philosophy of life. A judgment nearer divine would perhaps judge the culprit more according to his environment and understanding.

Society, as a matter of self defense, is committed to our rule. All offenders of legal responsibility are amenable to the same standard of law.

It can hardly be said that defendant was incapable of performing a premeditated intent to kill. He prepared for his crime with the greatest of detail. His motive was robbery. He armed himself with a deadly weapon. He broke and entered as a thief in the night. He masked to avoid recognition. He wore rubber gloves to avoid detection and fled to a distant point after the deed was done. "The deed was planned and executed with a degree of self possession and wicked-

ness equal only to the atrocity of the crime itself."
His only excuse to a court of justice is a lack of will
power to restrain his rampant desire. We hold the
evidence sufficient to sustain the verdict of the jury.

We now consider whether the verdict was concurred
in by all twelve jurors. It is claimed that it was not
concurred in by the juror, Morrison. While the jury
was being polled by the clerk the following occurred:

"The Clerk: Charles F. Morrison, is that your ver-
dict?

"Juror Morrison: No sir, it isn't mine. I vote first
degree murder with mercy, but not without it, and I
will not.

"The Court: It is your verdict except for the
mercy?

"Juror Morrison: Yes, sir, but I will not send that
man to the electric chair with my vote.

"The Court. It is your verdict?

"Juror Morrison: I am still for mercy.

"The Court: But you recommend mercy?

"Juror Morrison: Yes, sir."

Thereupon, defendant's attorney, Mr. Swink, inter-
rogated the juror further as follows:

"Mr. Swink: Mr. Morrison, this verdict is recorded
and the law says that the majority of the members
did not recommend mercy, that verdict will stand and
this man goes to the electrict chair, and regardless of
whether you want mercy or not. Would you say then,
and do you say now, that that is your verdict?

"Juror Morrison: I say first degree murder with
mercy, and I wouldn't vote any other way.

"Mr. Swink: Well, you have voted already.

"The Court: Don't argue with him; ask him any-
thing you want to.

"Mr. Swink: Mr. Morrison, is it your verdict of murder in the first degree,—is it your verdict when you know it carries the death penalty? Answer that yes or no.

"Juror Morrison: No.

"Mr. Swink: He said, no.

"The Court: I didn't hear him. What is your verdict, Mr. Morrison?

"Juror Morrison: My verdict is guilty in the first degree, with mercy.

"The Court: All right, is that clear, Mr. Swink?

"Juror Morrison: I don't propose to send him to the electric chair.

"The Court: Is that clear, Mr. Swink?

"Mr. Swink: Not quite judge, if it please the Court.—Is it still your verdict if it carries with it the death penalty?

"The Court: Now, Mr. Swink, you may ask this juror what his verdict is. The law fixes the penalty, not the jury; and a majority of the jury has the privilege of recommending him to the mercy of the Court. The jury has been polled, and you can figure for yourself whether there be a majority or not.

"Mr. Swink: If the Court please, may I ask Mr. Morrison one other question. Do you wish, Mr. Morrison, at this time, to change your verdict, or do you want your verdict to be recorded?

Juror Morrison: Let it be recorded."

It is clear to us as it must have been to the trial judge that the juror would agree to no other verdict.

The judgment is affirmed.

BROWN, C. J., WHITFIELD, TERRELL, CHAPMAN, and THOMAS, J. J., concur.

BUFORD, J. dissents.

BUFORD, J., dissenting.—The appeal for review judgment of conviction without recommendation to mercy of murder in the first degree.

Plaintiff in error presents two questions upon the determination of which he asks for a reversal of the judgment. They are as follows:

"1st. Should an accused person be put on trial for a capital crime when it appears, from a preliminary examination, that there is serious doubt as to his sanity?"

"2nd. Where the accused is tried on a charge of murder in the first degree and the undisputed evidence creates a serious doubt as to his sanity and one of the jurors refuses to convict unless with mercy, can it be said that the State is satisfied with the trial and put him to death?"

I cannot entirely concur in the majority opinion in this case.

The facts in this case present a condition for which we have cited no parallel, nor have I been able to find any case where like factual conditions have existed.

After having pleaded "not guilty," the accused was allowed to withdraw that plea and interpose the plea of "not guilty because of insanity." Thereupon, two learned and experienced physicians were appointed to examine the accused to determine his mental condition. These physicians performed their duty of examining the defendant and appeared in court and there first testified before the Circuit Judge, not in the presence of the jury, and later testified before the jury as to the defendant's mental condition. On completion of the examination before the trial judge, he held the defendant sane. The jury evidently

reached the same conclusion because the verdict was one of guilty of murder in the first degree and was without recommendation to mercy by a majority of the jury.

The rationale of the testimony of the physicians, as I gather it from the record, was definitely that the defendant was not of normal mental condition; that his mind was affected in some degree, but that he knew right from wrong; he knew when he was violating the law and he knew what the result of his unlawful act would be; that he fully realized what was a crime and what was not a crime, but that he was subject to hallucinations under the influence of which he could commit unlawful acts which, although he knew were unlawful and bring the punishment of the law, he, nevertheless, believed himself justified in the commission of the act, because of the influence of the hallucinations.

Except for this, he was above the average in mentality. He had a long criminal record and also a record of having been confined in institutions for mental treatment.

It is not necessary to set out in detail the testimony of the physicians. It is sufficient to say that my conclusion is (from all the testimony) that the defendant was of sufficient mentality to know right from wrong and to realize the consequences of his acts, but that the mental aberrations or hallucinations which he experienced at times, and which he is shown to have experienced at the time of the commission of the crime here under consideration were such that he was not capable of forming a premeditated design for which he was responsible. In other words, that although he could and did plan and design the com-

mission of the crime, his mental condition made him incapable of being held responsible for the premeditated design.

It appears to me that the defendant was subject to irrestible impulse or moral insanity. We have held, "the irrestible impulse or moral insanity doctrine is not recognized in this State as an excuse for an unlawful act." See Collins v. State, 88 Fla. 578, 102 Sou. 880. While we adhere to this enunciation, my view is that irresistible impulse or moral insanity may be such that the perpetrator of a crime may not be held responsible for the forming of a premeditated design while he is under the influence of such irresistible impulse or mental hallucination.

In Wharton on Law of Homicide (3d Ed. by Browlby) Sec. 539, the author says:

"Under the modern rule on this subject there is not deemed to be any condition intermediate between sanity and insanity which will mitigate crime without excusing it. And where a person committing a homicide was conscious of what he was doing, and capable of distinguishing between right and wrong, and premeditated the commission of the act, he is guilty of murder in the first degree, though he was deranged. Nor can a conviction of a lower degree of crime be had on the theory that the defendant's mind was unsound to a degree rendering him incapable of deliberation, where he knew the nature of the act. And insanity cannot reduce homicide from murder to manslaughter, unless the provocation was such, at least, as would stir the resentment of a reasonable man. Evidence of insanity, however, is admissible in such cases to show the absence of any deliberate or premeditated design. And one who killed another

when his mind was so far impaired as to render him incapable of deliberate, premeditated murder, but was not totally irresponsible by reason of his insanity, should be convicted of murder in the second degree only." Citing the following cases: Sindram v. People, 1 N. Y. Crim. Rep. 448; Sage v. State, 91 Ind. 141; Hempton v. State, 111 Wis. 127; 86 N.W. 596; Youtsey v. United States, 38 C.C.A. 562, 97 Fed. 937; Anderson v. State, 43 Conn. 514, 21 Am. Rep. 669; Cottell v. State, 12 Ohio C.C. 467; Green v. Com. 83 Pa. 75; Jones v. Com., 75 Pa. 403; Pistorious v. Com. 84 Pa. 158; Willis v. Com., 32 Gratt 929; Boren v. State, 32 Tex. Crim Rep. 637; 25 S.W. 775; Contra, Com. v. Hollinger, 190 Pa. 155, 42 Atl. 548; Com. v. Barner, 199 Pa. 335, 49 Atl. 60; Jarvis v. State, 70 Ark. 613, Appx. 67, S.W. 76.

These cases, while not entirely in point of fact parallel to the case before us, do support the principle which I think should be applied here.

My opinion is that while the defendants should not have been held excusable for the crime which he committed, he could not in this case be held responsible to the extent of being chargeable with the formulation of the premeditated design which resulted in the commission of the crime, and that the verdict and judgment should have been one of murder in the second degree.

On consideration of the entire record, I find no other reversible error.