THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. THOMAS TRANTINO, DEFENDANT-APPELLANT.

Argued January 18, 1965—Decided April 12, 1965.

*Mr. Albert S. Gross* argued the cause for appellant (*Messrs. Albert S. Gross* and *Herbert Koransky,* attorneys).

*Mr. Ronald J. Picinich,* Assistant Prosecutor, argued the cause for respondent (*Mr. Guy W. Calissi,* Bergen County Prosecutor, attorney).

The opinion of the court was delivered by

WEINTRAUB, C. J. Defendant, Thomas Trantino, appeals directly to us from a judgment imposing a death sentence. *R. R.* 1:2–1(c).

On the evening of August 25, 1963 Trantino and Frank Falco committed a robbery in Brooklyn, following which they

and some companions went to the Angel Lounge, a tavern in Lodi, New Jersey, for pleasure. During the early morning of the 26th, Trantino or someone else fired two shots in horseplay. Sergeant Peter Voto of the Lodi Police Department and Gary Tedesco, a young man who was about to be appointed a patrolman and who accompanied Sergeant Voto for a view of police routine, entered the tavern, presumably to investigate the report of gunfire.

Voto and Tedesco had been in the tavern earlier that morning. On the further visit following the gunfire just mentioned, Voto asked all of the patrons to establish their identity. Following inspection of identifying papers, Voto found a gun wrapped in a towel. Trantino thereupon seized the officer from behind, placed a gun to his head, cursed him and shouted that he would die. He ordered Voto to undress. Voto did so slowly, and as he did Trantino struck him repeatedly with the gun, forcing him to his knees. When Tedesco, who had gone out for a searchlight, re-entered, he was seized by Falco. Tedesco too was ordered to undress, and he did promptly. With Voto partially undressed and on the floor, almost unconscious from the blows, and with Tedesco stripped to his shorts, Trantino fired a number of shots at both, killing them almost instantly. There was testimony that Falco shouted to Trantino, "You're crazy. What are you doing? You're crazy," to which Trantino replied, "We are going for broke. We are burning all the way. We are going for broke."

Trantino and Falco fled, both returning to New York City. Falco was killed there a few days later by police officers who were trying to apprehend him. Trantino surrendered to New York authorities and was extradited to this State.

The resume of events given above was the State's version of the murders. In his defense Trantino testified that on the 25th he took two dexedrine pills and consumed a considerable quantity of liquor from the afternoon of that day to the time of the homicides on the 26th. He denied any recollection of the slaying of the officers, saying he recalled only a loud explosion, followed by a confusion of wild sound and light

within which Falco appeared to be a devil with arched eyebrows. He claimed he next recalled entering the car of a Mrs. Norma Jaconnetta (she left the tavern hurriedly after the shooting) and leaving the car with Falco when she was unable to start it. He related a frenzied flight to the home of a Mrs. Patricia MacPhail (she too had been at the Angel Lounge and had left just before the officers were shot), and described the drive with her help to New York. He insisted those events were heavily clouded.

Although Trantino thus disavowed awareness of the homicides, Mrs. MacPhail testified he told her the policemen were killed, at first saying that Falco had killed them and later saying during the ride to New York City that it was he, Trantino, who had slain them and that he did so to help Falco who was wanted for murder in New York.

The defense also offered psychiatric testimony to which we will refer later.

## I.

Defendant moved for pretrial inspection of the statements made by witnesses. The motion was denied. The trial court's action comported with *R. R.* 3:5-11 which bars inspection before trial of statements of prospective witnesses, subject of course to the discretionary power under *R. R.* 1:27A of a court to relax a rule "where it shall be manifest to the court that a strict adherence to them will work surprise or injustice." *State v. Reynolds,* 41 *N. J.* 163, 182-183 (1963), *cert.* denied 377 *U. S.* 1000, 84 *S. Ct.* 1930, 12 *L. Ed. 2d* 1050 (1964) ; *State v. Johnson,* 28 *N. J.* 133 (1958).

We emphasize that the application so denied was to inspect the statements in advance of trial. Defendant was entitled to see them at trial for the purpose of cross-examination, *State v. Hunt,* 25 *N. J.* 514 (1958) ; *State v. Mucci,* 25 *N. J.* 423 (1957), and that right was asserted and respected. In fact, the grand jury testimony was also made available at that time to the same end.

██ Since, in any event, prejudice must be shown upon a complaint on appeal that discovery was improperly denied, *State v. LaPierre,* 39 *N. J.* 156, 177 (1963), *cert.* denied *Bisignano v. New Jersey,* 374 *U. S.* 852, 83 *S. Ct.* 1920, 10 *L. Ed.* 2d 1073 (1963), defendant points to inconsistencies between the statements initially given by those witnesses and their later statements, and asserts the pursuit of the inconsistencies might have led to the discovery of other evidence leading to a different verdict. There is no factual support for that claim. The inconsistencies themselves do not suggest avenues for further investigation.

The witnesses conceded they lied initially, saying they did so either to protect Trantino and Falco or to avoid testifying. The sole specific matter to which defendant points in support of his speculation that further investigation would have helped him is in this excerpt from the statement of Patricia Falco:

"I heard Tommy curse at them and tell them to get on their knees and strip. The little detective looked scared and in two minutes was undressed. Then Tommy hit Voto with the gun and cursed him telling him 'You are going to die' over and over. He was saying this and I saw him shoot and shoot. I was very amazed. I don't know if he shot the both of them or if *I* just kept on shooting Voto."

The stress is upon the word "I" which is italicized near the end of this quotation. The witness explained that "he" was intended, and clearly that is so. It would be absurd to suppose this obvious error, if known before trial, might have led to proof that the witness, rather than Trantino, did the shooting.

II.

Several issues relate to evidence introduced by defendant with respect to his mental condition.

The defense offered background material which its expert, Dr. Kesselman, a neuropsychiatrist, used in giving opinions to which we will later refer. The background testimony in-

cluded the following: Defendant was expelled from high school at 14; was a heroin addict at 16; made several attempts to rid himself of the habit, all of which failed; that to support his habit, he ultimately needed $50 a day, which he obtained by robbery and burglary. In 1956 defendant, then 18, was sentenced to a long term in the Great Meadows Correctional Institution at Comstock, New York. He was released in 1961, after which he obtained a job and married. In 1963 he ran into Falco, whom he had met at the Comstock prison, and through that reunion he again embarked upon a course of crime, culminating in the events of the 25th and 26th already mentioned. Trantino did not return to heroin (apparently he did not use heroin at any time after his conviction in 1956), but following Falco's example he used a barbiturate in combination with liquor, which, according to defendant, sometimes induced hallucinations and sometimes a blankness.

Dr. Kesselman's diagnosis was sociopathic-personality disturbance, drug and alcoholic addiction with emotional instability, and depressive reaction, situational in character. The defense put a hypothetical question to him, calling for an opinion as to whether defendant "at the time of that alleged offense knew what he was doing was morally wrong." There was an objection and extended argument in the course of which the trial court tried to find out whether the defense sought an acquittal on the ground of legal insanity. Defendant complains that the trial court thus improperly compelled him "to disclose his defense of insanity during the trial in contravention of the better practice" which he attributes to *State v. Craig*, 9 *N. J. Super.* 18 (*App. Div.* 1950).

It is not clear precisely what was involved in *Craig*. We gather the Appellate Division had in mind only that a trial court should not prod a defendant to make a disclosure when to do so would infringe his option under the court rule (now *R. R.* 3 :7–3) not to make a statement at the opening of a trial. But obviously when evidence is offered by a defendant the prosecution is entitled to know the thesis upon which

the offer is made and the trial court cannot rule intelligently without the same disclosure. Hence the inquiry as to whether the defense sought an acquittal on the ground of legal insanity was perfectly proper.

Defendant complains also of another inquiry by the court with respect to the same hypothetical question. It will be recalled the question was whether defendant "knew what he was doing was morally wrong." The State objected to the vagueness of the word "what." In that connection the trial court said to defense counsel:

> "No, no, we want to know what. If you are talking about whether he knew taking drugs was wrong or are you talking about shooting two policemen? That is what we want to know."

Defense counsel replied, "Whatever he did, if your Honor please, as I described it in the question—whatever he did as I described it in the question." The question, however, was not explicit as to whether it did or did not include the hypothesis that defendant killed the officers, and hence counsel's answer led to a renewal of the court's question. This, defendant says, was prejudicial.

Defendant refers to *State v. Guido*, 40 *N. J.* 191, 198 (1963), where we said a party need not accept his adversary's factual claims in framing a hypothetical question, the adversary being free to explore his own thesis on cross-examination. That principle is not involved here. The trial court sought only to clarify the question itself so that the witness and the listener would have a common understanding of its import. We add that in response to the defense assertion that the court's question might have indicated to the jury that the court believed defendant was the slayer, the court expressly instructed the jury against that view.

Actually the trial court did not succeed in its effort either to elicit the purpose of the testimony or to clarify the hypothetical question. Nonetheless the trial court permitted the witness to answer the question as initially propounded, pointing out that in any event the testimony would be admissible

with respect to the issue of punishment. See *State v. DiPaolo,* 34 *N. J.* 279, 291 (1961), *cert.* denied 368 *U. S.* 880, 82 *S. Ct.* 130, 7 *L. Ed.* 2d 80 (1961). The witness was also permitted to give his opinion as to whether defendant was able to perform the mental operations necessary for the degree of murder the State charged, *i. e.,* to premeditate, deliberate and willfully execute the design to kill. See *State v. Vigliano,* 43 *N. J.* 44, 65 (1964); *State v. McAllister,* 41 *N. J.* 342, 352 (1964); *State v. DiPaolo, supra,* 34 *N. J.,* at *pp.* 294–297. The trial court, however, did not limit the psychiatric testimony to the issue of degree of guilt or the issue of punishment, and thus the evidence was received for whatever use defendant might make of it.

Later defendant asserted the defense of legal insanity and the trial court submitted the issue to the jury with the comment that "Very frankly I don't profess to understand the testimony that's been adduced here as indicating insanity as the law regards insanity." Defendant complains of this comment, and adds the trial court did not make it clear that the claim of insanity, if accepted, would require an acquittal. We think the court's comment was well within judicial discretion under the facts of this case, and that the jury understood it should acquit if it found defendant was legally insane at the time of the offense.[1] In fact we think there was no evidence to support a defense of legal insanity and for that further reason defendant was not aggrieved.

We adhere to the *M'Naghten* rule, see *State v. Lucas,* 30 *N. J.* 37, 68 (1959), and *State v. DiPaolo, supra,* 34 *N. J.,* at *p.* 291, under which legal insanity requires that (1) by reason of a defect of reason due to disease of the mind (2) the accused did not know the nature and quality of the act he was doing, or did not know it was wrong. There was no evidence of a mental disease of that character and effect.

---

[1] The charge should have directed the jury to say, if it found the defendant not guilty because of insanity, whether the insanity still continues. *State v. Vigliano,* 43 *N. J.* 44, 62 (1964). This omission is of no significance here, and is noted merely as a reminder.

Dr. Kesselman expressly said "The defendant is neither mentally defective nor is he psychotic," and although he found a sociopathic personality disturbance, drug and alcoholic addiction with emotional disturbance, and a depressive reaction, situational in character, he did not say that this illness or condition deprived defendant of an understanding of the nature of the criminal act or of its wrongfulness. Thus the witness did not find the existence of a disease and an impairment of reason due to disease within the meaning of *M'Naghten.* See *State v. Guido, supra,* 40 *N. J.,* at *pp.* 202–205; *State v. White,* 27 *N. J.* 158, 164 (1958).

The essence of the doctor's testimony is this:

"Q. On what do you base your answer to my last three questions, Doctor? A. I base it on the fact that under the influence of amphetamine compounds, like dexedryl, and the excessive intake of alcohol, the faculties of Thomas Trantino, namely, thinking, reasoning and judgment were so impaired, distorted and deranged that he was not able to exercise his usual restraint on his behavior.

\*     \*     \*     \*     \*     \*     \*     \*

BY THE COURT:

Q. When you say, 'could not exercise his usual restraint,' he knew what he was doing but he did not restrain them. Is that what you mean?

A. Yes, I mean that, sir."

On cross-examination the doctor testified:

"Q. You also state: 'He claims an amnesia for the details of the alleged homicide. He is capable of distinguishing right from wrong at the present time.' Is that correct? A. Yes.

Q. When did he start distinguishing the difference between right and wrong—what was it the present time, December 1st? A. I think some time after the toxic state he was suffering from at the time of the commission of the alleged offense began to be neutralized, and the toxicity began to wear off.

Q. Are you saying, Doctor, that during the time when the alleged offense took place that this man was temporarily insane, is that what you are saying? A. From my understanding of his behavior, I would say that he did suffer from an acute psychotic alcoholic psychosis.

Q. That is fine. What does that mean? A. That he was temporarily ill due to the toxic effect of alcohol at the time of the alleged offense."

Thus the maximum thrust of this testimony was that defendant's voluntary consumption of dexedrine and liquor led to the prostration of his mental faculties. It is settled that a condition so induced cannot lead to an acquittal, and this upon the demands of public security. *State v. White, supra,* 27 *N. J.,* at *pp.* 164–165; *State v. Wolak,* 26 *N. J.* 464, 477 (1958).

As the cases just cited reiterate, voluntary intoxication or use of drugs may be considered with respect to the degree of murder, *i. e.,* in determining whether the defendant in fact performed the mental operations which the State must prove to elevate murder in the second degree to murder in the first degree. See also *State v. Hudson,* 38 *N. J.* 364, 369 (1962). The trial court so instructed the jury, and of course the verdict of murder in the first degree expresses a rejection of defendant's testimony and the expert opinion resting upon it.

We should not be understood to say that the trial court ought not to have submitted the issue of legal insanity to the jury. A trial court should ordinarily leave the issue with the jury whenever the defense asserts it if there is the slightest doubt whether the evidence, lay or expert, tends to support it. With appropriate instructions as to what the law requires, juries are able to cope with the issue. It is wiser to pursue that course than to invite a controversy on appeal as to the sufficiency of the evidence. We have dealt with the sufficiency of the proof only to demonstrate why we believe the trial court's comment was not an improper exercise of discretion and why in any event defendant was not aggrieved.

Defendant also contends the trial court required the jury, in deciding upon punishment, to consider the many criminal acts which defendant revealed in his own defense. We do not read the charge to compel the jury to give effect to any fact in deciding whether to recommend life imprisonment. The court left the issue of punishment to the jurors to be resolved as they alone saw fit in the light of the whole record.

We add there is no basis for defendant's protest that the trial court should have given the issue of manslaughter to the jury. There was no evidence that either victim did anything to defendant which in law could constitute provocation, and there was no evidence that defendant killed in a passion induced by such provocation. See *State v. McAllister, supra,* 41 *N. J.,* at *pp.* 352–353; *State v. DiPaolo, supra,* 34 *N. J.,* at *p.* 299; *State v. Schilling,* 95 *N. J. L.* 145, 155 (*E. & A.* 1920).

### III.

Defendant contends the verdict was against the weight of the evidence as to the degree of guilt.

The trial court charged in clear terms that to raise murder from second degree to first degree the State had to prove premeditation, deliberation and willful execution of the design to kill, and carefully defined the meaning of those words. See *State v. DiPaolo, supra,* 34 *N. J.,* at *p.* 295. In this connection the trial court correctly charged, as we have already noted, that although the voluntary use of drugs or liquor cannot lead to an acquittal, nonetheless such use is relevant upon the question whether the three mental operations did in fact take place, and that if anyone of them did not occur because of the influence of drugs or liquor, defendant's guilt could not exceed murder in the second degree.

We cannot interfere with a jury's verdict unless "it clearly and convincingly appears that the verdict was the result of mistake, partiality, prejudice or passion." *R. R.* 1:5–1(a); *State v. Hudson, supra,* 38 *N. J.,* at *p.* 379. We could make no such finding in the light of the evidence relied upon by the State and recited at the outset of this opinion.

Defendant's principal emphasis is upon his claim that because of the dexedrine pills and the liquor he consumed he did not know what was going on. He stresses the opinion of Dr. Kesselman that the pills and liquor rendered defendant unable to perform the critical mental operations. The jury,

however, could reasonably decline to accept Trantino's testimony and Dr. Kesselman's opinion which depended largely if not wholly upon Trantino's word as to what he consumed and its effect upon him.

There was ample evidence from which the jury could conclude that Trantino knew what was going on and what he was doing. He did not menace Sergeant Voto until the officer discovered the gun. From what defendant told Patricia MacPhail, the jury could find he feared that arrests would follow discovery of the gun and that Falco would have to face a murder charge in New York. Trantino's own testimony as to events immediately before and immediately after the killings could be found to be inconsistent with the claim of alcoholic stupor at the time of the killings. He knew there was something to run from, and although he says he does not know what it was, the jury could conclude, as Mrs. MacPhail's testimony revealed, that defendant knew he had killed the policemen. In fact none of the witnesses who were at the tavern, nor a milkman from whom defendant sought a ride shortly after the murders, supported the claim of alcoholic prostration.

## IV.

Defendant asserts sundry issues relating to the admission of evidence, the trial court's interrogation of witnesses and of defendant, the charge to the jury, and the disposition of defendant's requests to charge. No purpose would be served by a discussion of the complaints. We have examined all of them and find no error.

The judgment is accordingly affirmed.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN —7.

*For reversal*—None.