## Commonwealth *v.* Campbell, Appellant.

Argued November 17, 1970.   Before BELL, C. J., COHEN, EAGEN, O'BRIEN and POMEROY, JJ.

*Thomas J. Burke,* with him *Gerald F. Glackin,* for appellant.

*Stewart J. Greenleaf,* Assistant District Attorney, with him *William T. Nicholas,* Executive Assistant District Attorney, *Parker H. Wilson,* First Assistant District Attorney, and *Milton O. Moss,* District Attorney, for Commonwealth, appellee.

490

Opinion by Mr. Chief Justice Bell, December 20, 1971:

William M. Campbell, III was indicted for the murder of William B. Thompson. Campbell was found guilty by a jury of voluntary manslaughter. Twenty motions for a new trial were filed and argued and denied, and he was sentenced to a period of from five to ten years in solitary confinement. This appeal was taken by the defendant, who was represented throughout all the proceedings in the lower Court, as well as in this appeal, by two Court-appointed attorneys.

The sordid facts in this case were established by the testimony of defendant himself and several other witnesses. On the afternoon of November 22, 1967, defendant met Thompson by chance at a bar in Philadelphia. Both men were homosexuals and they had known each other casually for some time. After drinking together for a few hours, they left the bar at approximately 10:30 P.M. by taxi for Thompson's apartment in Lower Merion Township, Montgomery County.

Defendant testified that when they reached the apartment, he went into the kitchen to make a drink for both of them. While in the kitchen, he took from his pocket a cube of sugar on which he knew LSD had been placed and he chewed it up.*

Defendant then went into the living room and sat and talked with Thompson, who had previously undressed. Soon thereafter, defendant began to feel the effects of the LSD and started jumping up and down on the sofa. Defendant suggested that they sniff amyl nitrate, a drug which produces a drowsy forgetfulness. Defendant and Thompson sniffed the amyl nitrate and went into the bedroom to pack a suitcase for a trip to Florida which they had been talking about. After

---

* Campbell stated that he had taken LSD (frequently referred to in the vernacular as "acid") on three previous occasions.

packing the suitcase, defendant placed the suitcase in the hallway outside the apartment. When he went back into the apartment, he undressed and both men then went to bed together. Defendant testified that his last recollection was that he and Thompson were again sniffing amyl nitrate in bed.

The next thing that defendant said he could remember was when he awoke and found Thompson dead beside him with a knife in his throat. Defendant testified that he withdrew the knife and attempted to revive Thompson with mouth-to-mouth resuscitation. Defendant then tried to wipe off and clean the knife, and then tried to flush his bloodstained shirt down the toilet. Soon thereafter, defendant left the apartment and hitchhiked a ride into the central part of Philadelphia.

At approximately 4:30 A.M. on the following day (Thanksgiving), defendant was seen in Dewey's Restaurant in Philadelphia. *He told a number of men there that he had to leave town because he had just stabbed a man six times with an icepick.* He also made a telephone call to John Gaul (with whom he worked) and told him that he had just killed Thompson with an icepick. One of the men who were present in Dewey's at the time informed a Philadelphia policeman of defendant's statements, and defendant was arrested at 4:50 A.M. Defendant was questioned, searched and examined for possible use of narcotics because his eyes were "glassy." The police found in defendant's possession an envelope containing a Sears Roebuck & Company credit card with Thompson's name thereon. A detective, John Hoff, attempted to telephone Thompson and, after receiving no answer, released the defendant. Defendant thereupon returned to his room at the YMCA, and telephoned his mother to tell her he was coming home for Thanksgiving. Defendant then

boarded a bus for Chicago, where his parents were living.

Defendant spent a couple of days with his parents in Chicago and, on November 26, 1967, went to Miami, Florida. He spoke with his mother by phone on Wednesday, November 29, and during the course of the conversation his mother told him that the F.B.I. had been there searching for him. The following morning at 10:30 o'clock, defendant went to the F.B.I. offices in Miami, where, after being given the required legal warnings, he gave a formal statement or confession. A short time thereafter he returned to Montgomery County, where he was indicted and prosecuted for the murder of Thompson.

Defendant testified, inter alia, that he had no recollection of the events occurring between the hours of midnight November 22nd and 2:00 A.M. November 23, 1967.

Dr. Harvey Bartle, Jr., a neurologist and psychiatrist, testified as an expert witness for the defendant. He testified that in his professional opinion the defendant was telling the truth when he said that he had taken LSD and that his lack of recollection or amnesia *during the critical hours* of November 23rd was due to his ingestion of LSD. He further testified that as a result of this LSD, defendant did not know the difference between right and wrong or the consequences of his acts, and that during these critical hours he was legally (temporarily) insane. He also testified about the differences between (a) the effects of alcoholic intoxication and (b) mental aberrations brought about by LSD. Basically, his testimony was that alcoholic intoxication produces a predictable effect,* while the

---

* This is an unusual statement. It is a matter of common knowledge that alcoholic intoxication affects countless people differently and produces a different, and at times an unpredictable, effect on very many people.

effects of LSD on each individual can vary greatly and are not predictable. LSD (he said) affects each individual differently and often affects the same individual in a different manner on each occasion. We repeat: Dr. Bartle testified, based upon (a) what defendant told him, and (b) his two examinations of defendant, and (c) upon his professional knowledge, and (d) his aforesaid analytical testimony, that *during the period of the killing* defendant was legally insane. Dr. Bartle admitted that when he saw the defendant, the defendant knew the difference between right and wrong and knew that it was wrong to kill. Moreover, there was no evidence that defendant had ever been psychotic before.

This defense and Dr. Bartle's testimony raise very important and novel legal questions: (1) Should the voluntary ingestion of LSD or similar drugs have the *same legal effect* in a killing as *voluntary intoxication* from alcohol, i.e., reduce the crime from murder in the first degree* to murder in the second degree, if there was no intention to take life, or (2) should it have the same legal effect as legal insanity, namely, be a complete legal defense to any crime?

Appellant's principal contention is that the lower Court erred in charging the jury that "insanity" caused by the voluntary taking of LSD could not completely excuse a killing, but would reduce the gravity (and degree) of the crime from first degree murder to second degree murder if the jury believed that the (voluntary ingestion of) LSD prevented defendant from forming a specific intent to take decedent's life.

It is a matter of widespread common knowledge that the use of drugs has a deleterious effect upon and is dangerous to the user and has become a major cause of the increasing crime wave which is inundating our

---

* See cases infra.

Country, with resulting greatly increased danger to the safety, security and welfare of our law-abiding people.

The law with respect to voluntary intoxication has recently been reiterated in *Commonwealth v. Ingram*, 440 Pa. 239, 270 A. 2d 190, where the Court said (page 245) : "In Commonwealth v. Reid, 432 Pa. 319, 247 A. 2d 783, this Court said (page 322) : 'Generally speaking, voluntary drunkenness neither exonerates nor excuses a person for his criminal acts. Commonwealth v. Simmons, 361 Pa. 391, 65 A. 2d 353 (1949), cert. denied, 338 U.S. 862, 70 S. Ct. 96 (1949). However, where the charge is felonious homicide, intoxication which is so great as to make the accused incapable of forming a wilful, deliberate, and premeditated design to kill, or incapable of judging his acts and their consequences, may serve to reduce the crime of murder from the first to the second degree. Commonwealth v. Simmons, supra. See also Commonwealth v. Walters, 431 Pa. 74, 244 A. 2d 757 (1968).' This has been the well-established and frequently reaffirmed law of Pennsylvania, and we believe there is no reason or justification for any change. See Commonwealth v. Brown, 436 Pa., supra; Commonwealth v. Brabham, 433 Pa. 491, 494, 252 A. 2d 378; Commonwealth v. Walters, 431 Pa. 74, 83, 244 A. 2d 757; Commonwealth v. Detweiler, 229 Pa. 304, 308-309, 78 Atl. 271; Commonwealth v. Cleary, 135 Pa. 64, 85, 19 Atl. 1017; Jones v. Commonwealth, 75 Pa. 403."

Defendant contends that the law with respect to voluntary intoxication is such because human experience has shown the effects of taking alcohol are predictable, but not predictable with LSD. The expert testimony in this case (if believed—see *Commonwealth v. Carroll*, 412 Pa. 525, 194 A. 2d 911; *Commonwealth v. Chermansky*, 430 Pa. 170, 242 A. 2d 237; *Commonwealth v. Winebrenner*, 439 Pa. 73, 265 A. 2d 108, and

half a dozen recent cases cited therein) showed (we repeat) that LSD produces widely varying results among different persons and even different results with the same person on different occasions. This distinction of non predictability of effect on the human body is devoid of any adequate legal justification based upon legal precedent, or reason, or policy considerations for a radical change and departure from our law of criminal responsibility. The very fact that the effects of a voluntary, nonmedical use of a hallocinogenic drug are predictably *un*foreseeable should require Courts to decide in the public interest that this is not legally sufficient to *completely exculpate* a person from murder or any criminal act.

The overwhelming view of our sister Courts and of jurisprudential thought in this Country today supports our decision, i.e., there should be no legal distinction between the voluntary use of drugs and the voluntary use of alcohol in determining criminal responsibility for a homicidal act. See, viz., *State v. Trantino,* 44 N.J. 358, 209 A. 2d 117; *State v. White,* 27 N.J. 158, 142 A. 2d 65; *DeBerry v. Commonwealth,* 289 S.W. 2d 495 (Ky.); *People v. Corson,* 34 Cal. Rptr. 584, 221 C.A. 2d 579; *State v. Blassingame,* 221 S.C. 169, 69 S.E. 2d 601; Roberson's Criminal Law, §669, page 104; 1 Wharton, Criminal Law and Procedure (12th ed.), 1957; Weihofen, Mental Disorder as a Criminal Defense, pages 124-129 (1954); 1 Wharton and Stille, Med. Jur. §245.

In this appeal, defendant alleges many additional errors which he contends are sufficient either singly or cumulatively to entitle him to a new trial. His first contention is that the lower Court erred by allowing the jury to deliberate for too long a period of time before bringing in a verdict of guilty. The length of the deliberation of a jury is wisely left to the sound

discretion of the trial Judge, and we reverse only if we find a clear abuse of discretion, or that the verdict was the product of coercion or of an overworked and fatigued jury. *Commonwealth v. Moore,* 398 Pa. 198, 157 A. 2d 65. Under the facts in this case, there is no merit in this contention of the defendant.

Defendant's next contention is that there was prejudicial error in admitting into evidence certain photographs which were allegedly inflammatory. There was no abuse of discretion in the admission of these photographs, especially when accompanied or followed by appropriate instructions by the trial Court. See *Commonwealth v. Chasten,* 443 Pa. 29, 275 A. 2d 305, and the numerous cases cited therein.

The next alleged error was the use of a police fingerprint sheet from the State of Delaware bearing appellant's fingerprints, which had written on a corner of the card the notation "record." The card was never shown or read to the jury, nor ever received into evidence, and the only reference to it was made at a sidebar conference out of the hearing of the jury. Under these circumstances, no possible prejudice or harm resulted to defendant.

We deem it unnecessary to discuss with particularity defendant's additional contentions, viz., error in the admission of testimony concerning bloodstains found on the suitcase in the hallway near decedent's apartment; error in denying a pretrial inspection of a pair of slacks; (see *Commonwealth v. Caplan,* 411 Pa. 563, 192 A. 2d 894; Pa. R. Crim. P. 310) ; defendant's offer of a prior adjudication of *incompetency of the deceased victim* in order to prove self-defense, when his defense at trial was not self-defense but blackout, was totally irrelevant; and the allegedly unfair and prejudicial conduct of and questions by the district attorney.

It will suffice to say that we have carefully examined the record and find no merit in any of the twenty contentions of the defendant.

Judgment of sentence affirmed.

Mr. Justice JONES and Mr. Justice ROBERTS took no part in the consideration or decision of this case.

Mr. Justice COHEN took no part in the decision of this case.

---

CONCURRING OPINION BY MR. JUSTICE POMEROY:

I agree that, at this stage of our scientific knowledge, the appellant's voluntary ingestion of hallucinogenic drugs, and his resultant disorientation, should be likened to voluntary intoxication and not to legal insanity. I thus concur in the opinion of the Court that the trial judge committed no error in so presenting the issue to the jury.