THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. THOMAS TRANTINO, DEFENDANT-APPELLANT.

Argued May 18, 1965—Decided June 14, 1965.

*Mr. Albert S. Gross* argued the cause for appellant (*Messrs. Albert S. Gross* and *Herbert Koransky,* attorneys).

*Mr. Ronald J. Picinich,* Assistant Prosecutor, argued the cause for respondent (*Mr. Guy W. Calissi,* Bergen County Prosecutor, attorney).

The opinion of the court was delivered

PER CURIAM. We recently affirmed a judgment imposing a death sentence upon defendant. *State v. Trantino,* 44 *N. J.* 358 (1965). While the appeal was pending, defendant moved before the trial court for a new trial and we directed that the motion be pursued notwithstanding the pendency of the appeal. After hearing, the trial court entered an order denying the motion for a new trial, and the appeal from that order is now before us.

The sole question is whether because of pretrial publicity defendant was denied a fair trial in violation of the Federal and State Constitutions. The issue should have been advanced at the latest at the time of the selection of the jury since all of the matters relied upon were then fully known. In fact, before trial defendant moved for a change of venue but withdrew the motion with a statement by experienced counsel that he was confident an unbiased jury could be drawn. Although, as we have said, the issue in strictness should have been raised before conviction, the trial court decided the motion on its merits and so do we.

The case attracted considerable publicity. Two police officers were ruthlessly slain. The suspects were identified imme-

diately, and they having fled, an alarm was broadcast for their apprehension. One of them, Falco, was killed a few days later when he resisted arrest. Defendant, Trantino, surrendered to New York police. He fought extradition, and those proceedings too were publicized.

Defendant relies primarily upon two news items under date of August 27, 1963. One account reports an interview with the county prosecutor, in which the prosecutor stated that Trantino and Falco were wanted for the murders. The other story attributes to a local police officer the details of a statement purportedly taken from Patricia MacPhail in which she said Trantino told her he had killed the officers.

■ Insofar as the prosecutor disclosed that Trantino and Falco were wanted for the killings, the prosecutor did not go beyond the limits on pretrial releases we set in *State v. Van Duyne*, 43 *N. J.* 369 (1964), *cert.* denied 380 *U. S.* 987, 85 *S. Ct.* 1359, 14 *L. Ed.* 2d 279 (1965), for obviously the public interest permits a broadcast for suspects who apparently are in flight. Insofar as the prosecutor's statements revealed in detail the alleged actions of Trantino and Falco in perpetrating the crimes, the prosecutor's statements did go further than the occasion required. So also with respect to the disclosure of the content of the MacPhail statement. No criticism of either officer is here intended since the events antedated *Van Duyne*. And we add at once that these statements contained nothing whatever that was inadmissible at trial, and further that their content coincided in all essentials with the evidence that was admitted at trial. The prosecutor's account in fact attributed to Falco a larger measure of activity than appeared in the trial testimony, and of course to that extent the discrepancy, if anyone recalled the news item in question, would have favored Trantino.

■ The issue before us is not whether the statements made by the public officers fell within or without *Van Duyne*. Rather the question is whether those statements in fact denied defendant's right to a fair trial. *Van Duyne* seeks to protect and defend that right by preventing official statements which

might impair it, but upon the motion here made there must appear a likelihood that the verdict was tainted by a prejudice born of pretrial publicity.

We see no evidence of prejudice. The murder occurred on August 26, 1963. The case was not brought to trial until February 3, 1964, thus allowing ample time for whatever feelings the killings generated to subside and detailed recollections to fade. Each prospective juror was questioned in absence of the jury panel, and upon acceptance each juror was immediately sequestered. Thus no member of the panel heard the *voir dire* examination of another. Twenty-one of the 115 jurors examined expressed a belief Trantino was guilty, and of course they were excused, but 14 jurors were chosen who swore they were free of prejudgment or prejudice, and we see no reason to doubt the honesty of their responses. Indeed the defense used but 13 of its 20 peremptory challenges. Further, the *voir dire* examinations of the jurors did not suggest to the defense the need for a motion for a continuance or for a change of venue. And we repeat that the pretrial disclosures contained nothing that was inadmissible and nothing inculpatory that was not proved at the trial. In these circumstances we see nothing to support the motion for a new trial. The trial court correctly denied it.

Neither *Irvin v. Dowd,* 366 *U. S.* 717, 81 *S. Ct.* 1639, 6 *L. Ed. 2d* 751 (1961), nor *Rideau v. State of Louisiana,* 373 *U. S.* 723, 83 *S. Ct.* 1417, 10 *L. Ed. 2d* 663 (1963), supports defendant. There of course is no simple statement of a solvent in these matters. Ultimately the result depends upon a gross reaction to the total facts. We see no support for defendant in the factual complex of either *Irvin* or *Rideau.*

In *Irvin* six murders were committed in the vicinity of Evansville, Vanderburgh County, which adjoins Gibson County, both in Indiana. The police issued press releases to the effect that defendant had confessed to all of those killings. He was indicted in Vanderburgh County for the murder which resulted in his conviction. He sought a change of venue, and it was granted, but to Gibson County. The defense

then sought a change to another county which was denied apparently because the statute permitted but one change. During the four weeks in which the jury was selected, the defense made two more motions for change of venue and eight motions for continuances, all of which were denied. The Court found "the build-up of prejudice is clear and convincing." A roving reporter solicited the views of citizens as to guilt and punishment, and a recording of the interviews was later broadcast on local stations. The extensive publicity continued in the period between the crimes and the trial. The stories revealed crimes committed by defendant as a juvenile, a conviction for arson, a conviction for burglary, and a court-martial on AWOL charges; that he was a parole violator; that he refused to confess and later that he did confess to the six murders; that he offered to plead in exchange for a 99-year sentence, but the prosecutor was determined to get a death sentence; that defendant confessed also to 24 burglaries, with commentators noting resemblances to the murder cases; that a Kentucky sheriff had pledged himself to secure defendant's execution; that defendant was remorseless; that he was examined and found sane; that counsel for defendant had to respond to criticism of his willingness to represent defendant. On the day before trial the newspapers said defendant had orally admitted the slaying of the six victims. In the selection of the jury, 268 were excused for cause because of fixed opinions as to guilt. Almost 90% of the prospective jurors examined had some opinion as to guilt, ranging from mere suspicion to absolute certainty. Eight of the 12 jurors finally empaneled thought defendant was guilty. Upon the totality of these circumstances, the Court found defendant was denied a fair trial. In the course of the opinion the Court noted (366 *U. S.,* at *p.* 722, 81 *S. Ct.,* at *p.* 1642, 6 *L. Ed. 2d,* at *p.* 756):

"It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of

those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."

*Rideau* too involved a factual pattern which in nowise resembles the facts before us. There a motion picture film with a sound track was made of an "interview" between the sheriff and defendant in which defendant admitted the robbery, kidnapping and murder. The film was shown on television on three occasions before a total estimated audience of 106,000. The population of the parish was 150,000. The defendant's motion for a change of venue was denied. Three members of the jury had heard the televised "interview" and two jurors were deputy sheriffs. The defense challenges of these jurors for cause were overruled, and since no peremptory challenges remained, they served. The Supreme Court, finding the "film" in fact was a public "trial" of defendant, held it was a denial of due process to reject the motion for a change of venue. The facts of the case on hand do not approach the situation there involved.

The order denying the motion for a new trial is affirmed.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, HALL, SCHETTINO and HANEMAN—6.

*For reversal*—None.