UNITED STATES of America ex rel.
Thomas TRANTINO, Petitioner,

v.

Robert HATRAK, etc., Respondent.

Civ. A. No. 74–145.

United States District Court,
D. New Jersey.

February 19, 1976.

Jeffrey E. Fogel, Newark, N. J., for petitioner.

William F. Hyland, Atty. Gen. of N. J. by Howard Allen Cohen, Deputy Atty. Gen., Trenton, N. J., for respondent.

## OPINION

STERN, District Judge.

This is a petition for a writ of habeas corpus to compel the release of Thomas Trantino from state custody. Trantino was convicted of murder in the first degree in connection with the 1963 slaying of police officer Peter Voto and Gary Tedesco. He is presently incarcerated in the New Jersey State Prison at Rahway, serving a sentence of life imprisonment.

This case has accumulated a lengthy procedural history. The original judgment of conviction was entered by the Bergen County Court in 1964, following trial by jury. The petitioner was sentenced to death. The New Jersey Supreme Court affirmed the conviction on mandatory appeal. *State v. Trantino*, 44 N.J. 358, 209 A.2d 117 (1965) (Weintraub, C. J.). A motion for a new trial was then filed in Bergen County Court. After an evidentiary hearing, the motion was denied. The denial of relief was affirmed on appeal by the New Jersey Supreme Court. *State v. Trantino*, 45 N.J. 37, 211 A.2d 193 (1965), *cert. denied*, 382 U.S. 993, 86 S.Ct. 573, 15 L.Ed.2d 479 (1966), *reh. denied*, 383 U.S. 922, 86 S.Ct. 901, 15 L.Ed.2d 679 (1966).

Petitioner next brought a petition for a writ of habeas corpus in United States District Court. After an evidentiary hearing, the petition was dismissed for failure to exhaust state remedies. *Trantino v. Yeager*, Civ. No. 351–66 (D.N.J., June 24, 1966). Trantino then filed a petition for post-conviction relief in Bergen County Court. The petition was denied after another evidentiary hearing. The Supreme Court of New Jersey affirmed the denial of post-conviction re-

lief. *State v. Trantino*, 60 N.J. 176, 287 A.2d 177 (1972). In the same year, however, the petitioner succeeded in vacating the death sentence originally imposed. He was re-sentenced *nunc pro tunc* to life imprisonment. *State v. Funicello, et al.*, 60 N.J. 60, 286 A.2d 55 (1972), *cert. denied*, 408 U.S. 942, 92 S.Ct. 2849, 33 L.Ed.2d 766 (1972). In 1974 the petitioner filed the present lawsuit.

Trantino's trial in Bergen County Court took place during February 1964. After establishing the *corpus delicti*, the State presented the testimony of three eye-witnesses and one ear-witness. Each testified that he or she saw or heard the petitioner shoot the victims.[1] The defense presented the testimony of petitioner Trantino, that of Trantino's mother and brother, and that of a psychiatrist. In rebuttal the State presented the testimony of the woman who drove Trantino to New York following the murders and that of the State's own psychiatrist. The initial opinion of the New Jersey Supreme Court affirming the conviction contains a summary of the testimony adduced at trial:

> On the evening of August 25, 1963 Trantino and Frank Falco committed a robbery in Brooklyn, following which they and some companions went to the Angel Lounge, a tavern in Lodi, New Jersey, for pleasure. During the early morning of the 26th, Trantino or someone else fired two shots in horseplay. Sergeant Peter Voto of the Lodi Police Department and Gary Tedesco, a young man who was about to be appointed a patrolman and who accompanied Sergeant Voto for a view of police routine, entered the tavern, presumably to investigate the report of gunfire.

> Voto and Tedesco had been in the tavern earlier that morning. On the further visit following the gunfire just mentioned, Voto asked all of the pa-

---

1. The eye-witnesses were surviving members of the Trantino-Falco party at the Angel Lounge: Mrs. Sarah Jane Vander Fliet (2T, 179–212; 3T, 216–321); Mrs. Patricia Falco (3T, 321–379; 4T, 382–440); and Mrs. Norma Jaconetta (4T, 510–542; 5T, 544–600). The ear-witness was the bartender at the Angel Lounge, Nicholas Kayal (4T, 441–501).

trons to establish their identity. Following inspection of identifying papers, Voto found a gun wrapped in a towel. Trantino thereupon seized the officer from behind, placed a gun to his head, cursed him and shouted that he would die. He ordered Voto to undress. Voto did so slowly, and as he did Trantino struck him repeatedly with the gun, forcing him to his knees. When Tedesco, who had gone out for a searchlight, reentered, he was seized by Falco. Tedesco too was ordered to undress, and he did promptly. With Voto partially undressed and on the floor, almost unconscious from the blows, and with Tedesco stripped to his shorts, Trantino fired a number of shots at both, killing them almost instantly. There was testimony that Falco shouted to Trantino, "You're crazy. What are you doing? You're crazy," to which Trantino replied, "We are going for broke. We are burning all the way. We are going for broke."

Trantino and Falco fled, both returning to New York City. Falco was killed there a few days later by police officers who were trying to apprehend him. Trantino surrendered to New York authorities and was extradited to this State.

The résumé of events given above was the State's version of the murders. In his defense Trantino testified that on the 25th he took two dexedrine pills and consumed a considerable quantity of liquor from the afternoon of that day to the time of the homicides on the 26th. He denied any recollection of the slaying of the officers, saying he recalled only a loud explosion, followed by a confusion of wild sound and light within which Falco appeared to be a devil with arched eyebrows. He claimed he next recalled entering the car of a Mrs. Norma Jaconnetta (she left the tavern hurriedly after the shooting) and leaving the car with Falco when she was unable to start it. He related a frenzied flight to the home of a Mrs. Patricia Mac-Phail (she too had been at the Angel Lounge and had left just before the officers were shot), and described the drive with her help to New York. He insisted those events were heavily clouded.

Although Trantino thus disavowed awareness of the homicides, Mrs. Mac-Phail testified he told her the policemen were killed, at first saying that Falco had killed them and later saying during the ride to New York City that it was he, Trantino, who had slain them and that he did so to help Falco who was wanted for murder in New York.

The defense also offered psychiatric testimony . . .

*State v. Trantino*, 44 N.J. 358, 361–363, 209 A.2d 117, 118–119 (1965).

■ While the psychiatric testimony presented by the defense was intended to negate the possibility that petitioner was capable of forming culpable intent at the time of the murders, it also further inculpated Trantino. In recounting the interview upon which he based his medical conclusions, the defense psychiatrist testified to certain admissions made by Trantino which were inconsistent with important portions of his direct testimony.[2] The weight of the evidence adduced at the state trial is normally beyond the purview of a federal court in the exercise of its habeas corpus jurisdiction, absent allegations of harmless error. *Cf. Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). It is nonetheless clear from the state record that the evidence of Trantino's factual guilt was overwhelming.

In this petition, Trantino claims that his conviction was obtained in violation of the Sixth and Fourteenth Amendments to the United States Constitution. He alleges six specific violations of his rights. These are, as he has categorized them:

2. Compare the testimony of Dr. Samuel Kesselman (7T, at pp. 827–828), with that of petitioner (6T, at 695–698).

(A) That the state prosecutor and his staff deprived petitioner's counsel of the opportunity to interview and confront eye-witnesses to the crime prior to trial.

(B) That the state trial judge failed to hold a hearing on petitioner's competency to stand trial despite evidence casting some doubt on the matter.

(C) That medication administered to the petitioner impaired his ability to aid in the preparation and conduct of his defense, suppressed symptoms of mental illness, and adversely affected his demeanor in court.

(D) That petitioner was denied the effective assistance of his own psychiatrists by the state's failure to inform them of the psychoactive drugs he was taking, that he was denied the effective assistance of counsel in that the state was permitted to conduct a psychiatric examination in the absence of petitioner's counsel.

(E) That the trial judge improperly charged the jury with respect to the burden of proof on culpable mental state.

(F) That the petitioner was denied a fair and impartial trial because of massive pretrial publicity.

The threshold inquiry for this Court with respect to these contentions is mandated by the habeas corpus statute. Unless petitioner has exhausted his state remedies, as a matter of comity this Court cannot hear his claims. Title 28 United States Code, § 2254(b); *Picard v. Connor*, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *United States ex rel. Hayward v. Johnson*, 508 F.2d 322, 329–330 (3rd Cir. 1975), *cert. denied*, 422 U.S. 1011, 95 S.Ct. 2637, 45 L.Ed.2d 675 (1975); *Ralls v. Manson*, 503 F.2d 491, 493–494 (2nd Cir. 1974).

The State concedes, and the record demonstrates, that the petitioner has exhausted his state remedies with respect to allegations (A), (B), (C), (E) and (F). These matters were presented to the state courts on direct appeal and in post-conviction relief proceedings. They will therefore be considered here on the merits.

Allegation (D) raises more troublesome issues of exhaustion. (D), although here pleaded as one, contains several discrete issues. First, the petitioner claims that his rights to a fair trial under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), were violated. The asserted violation is the failure of the state to inform defense counsel and defense psychiatrists of petitioner's regimen of psychoactive drugs. Second, Trantino claims that the post-indictment questioning by a state psychiatrist should not have been conducted in the absence of his counsel or of his own psychiatrist. This Court has carefully reviewed the petitions and briefs in the prior state proceedings. *See, United States ex rel. Geisler v. Walters*, 510 F.2d 887, 890 n.4 (3rd Cir. 1975). The issues sought to be raised in allegation (D) were not presented to the state courts before, on direct appeal [*See*, R–14, R–21; *State v. Trantino*, 44 N.J. 358, 209 A.2d 117 (1965)]; on petitioner's Motion for a New Trial [*See*, R–34 at 50–55; R–24; *State v. Trantino*, 45 N.J. 37, 211 A.2d 193 (1966)]; or in petitioner's Petition for Post-Conviction Relief [*See*, R–34 at 144–178; R–29; *State v. Trantino*, 60 N.J. 176, 287 A.2d 177 (1972)].

■ The State initially opposed consideration of both issues here for failure to exhaust state remedies. With respect to the issue based on *Brady v. Maryland*, they now request this Court to decide the question without a remand. (Tr. 4/25/75 at 6–7) Under certain circumstances, the state may waive the normal requirement of exhaustion of state remedies contained in Title 28 United States Code, § 2254(b). *United States ex rel. Boyance v. Myers*, 372 F.2d 111, 112 (3rd Cir. 1967); *Jenkins v. Fitzberger*, 440 F.2d 1188, 1189 (4th Cir. 1971). *Cf. United States ex rel. Kelly v. Maroney*, 414 F.2d 1228, 1231 (3rd Cir. 1969). Petitioner's *Brady* claim will accordingly be considered and disposed of here on its merits.

■ With respect to the remaining issue subsumed in (D), the State presses

its argument that Trantino's failure to present his claim to the state courts compels dismissal here. Despite the protracted nature of the litigation surrounding petitioner's conviction, this Court is constrained to agree. The psychiatric examinations conducted by Drs. Collins & Zigarelli under the terms of a rather broad court order (*see* 1 PT, 8–9) raise serious Fifth and Sixth Amendment issues. Both examinations occurred after indictment, but prior to the appointment of counsel for the petitioner. Compare *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *United States v. Alvarez,* 519 F.2d 1036, 1042 (3rd Cir. 1975); and *United States ex rel. Smith v. Yeager,* 336 F.Supp. 1287, 1305 (D.N.J.), *aff'd,* 451 F.2d 164 (3rd Cir.), *cert. denied,* 404 U.S. 859, 92 S.Ct. 112, 30 L.Ed.2d 101 (1971); with *United States ex rel. Stukes v. Shovlin,* 464 F.2d 1211 (3rd Cir. 1972). The state factual record is meager with respect to the circumstances of the examinations because these issues have not been presented to the state courts. State relief is not foreclosed to Trantino on these points. *See* N.J. Rule 3:22–4; *State v. Odom,* 113 N.J.Super 186, 189, 273 A.2d 379, 381 (App.Div.1971). In noting that the claims advanced sound in constitutional law, this Court, of course, indicates no opinion whatsoever either upon their merits or upon the question of harmless error if they are meritorious. The habeas statute itself requires these issues to be presented to the state courts in the first instance. The remaining portion of. allegation (D) will therefore be dismissed for failure to exhaust state remedies, as required by Title 28 United States Code, § 2254(b).

The parties to this litigation have stipulated that the remaining claims may be decided on the basis of the record as developed in the state courts, supplemented by the evidentiary hearing conducted in the prior federal lawsuit and by certain depositions and affidavits filed in this Court. (Tr. 7/3/74 at 4; Tr. 4/25/75 at 4) Neither party seeks an evidentiary hearing in this Court. *United ed States ex rel. Williams v. Brierley,* 291 F.Supp. 912, 914 (E.D.Pa.1968).

(A) The first claim advanced by Trantino is that the state denied him the opportunity to confront and interview eye-witnesses to the crime prior to the trial. It should be noted that shortly after his arrest the state court appointed one of the most highly regarded lawyers in Bergen County as his counsel. This attorney, the head of his law firm, was in turn assisted by a junior. The state court did more. It appointed a defense investigator to assist the assigned attorneys, and, in addition appointed at public expense two defense psychiatrists. The resources thus available to petitioner were indeed considerable.

The names of five of the surviving eye-witnesses to the crime were provided by petitioner to his chief trial counsel, Albert Gross (PCR at 209). Four of the witnesses were females who were patrons of the Angel Lounge at the time of the shootings. The fifth was the bartender. Gross gave these names to the defense's court-appointed investigator, one Webster. The asserted denial of access concerns only the four female witnesses, Patricia MacPhail, Sarah Vander Fliet, Norma Jaconetta and Patricia Falco.

Witnesses belong neither to the prosecution nor to the defense. Both sides have an equal right, and should have an equal opportunity to interview them. *United States v. Murray,* 492 F.2d 178, 194 (9th Cir. 1973); *United States v. Matlock,* 491 F.2d 504, 506 (6th Cir. 1974); *Gregory v. United States,* 125 U.S.App.D.C. 140, 369 F.2d 185, 188 (1966), *cert. denied,* 396 U.S. 865, 90 S.Ct. 143, 24 L.Ed.2d 119 (1967). However, while it is true that a witness is not to be prevented from speaking to the defense by the prosecution, it is equally true that a witness cannot be required to speak to an investigator or an attorney. The matter rests, or at least it should rest, entirely with the witness. *United States v. Matlock, supra,* at 506–507; *McCabe v. North Carolina,* 314 F.Supp. 917, 921 (M.D.N.C.1970).

The issue of access to witnesses was fully litigated at the evidentiary hearing afforded to Trantino on his post-conviction relief petition. Testimony was taken at this hearing from investigator Webster, Prosecutor Calissi, and Gross. At the close of the hearing the state judge made findings of fact and conclusions of law (PCR 466a–474a). Among his factual findings were these: that Sarah Vander Fliet was simply not located by the defense investigator after rather cursory efforts; that Norma Jaconetta was produced for a formal deposition at Gross' request, and that Gross made no objection to the formality of the procedure or to the presence of the prosecutor; and that the remaining witnesses MacPhail and Falco, did not wish to speak with the defense investigator. The state judge further found it to be a fact that the prosecutor had not instructed the witness to refuse to answer questions of the defense. Finally, the court noted that no contemporaneous defense application was made to the court for relief.

An examination of the PCR hearing records reveals ample support for the determinations of fact reached by the state judge, within the meaning of *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), and Title 28 United States Code, § 2254(d). These findings of fact are further corroborated by the depositions taken and exhibits filed in the instant lawsuit.

Pursuant to Title 28 United States Code, § 2251, both parties consented to supplement the record by utilizing the depositions of Patricia Falco, Stephen Delaney (petitioner's investigator in the present action), and Frederick Galda (the First Assistant Prosecutor of Bergen County who helped prepare the Trantino murder prosecution). (Galda Affidavit, ¶ 2) The depositions of Falco and Galda strongly corroborate the findings of fact made by the PCR judge. The exhibits include the following witness form, executed by MacPhail (R–34, 1); Falco (FD 82); and Kayal (G–D, Ex. R–5):

January 27, 1964
Re: *State v. Trantino*

You, as a witness in this case, are not obliged to discuss this case with any stranger or anyone else.

If requested by defense, you are not obliged to give any statement *unless you voluntarily wish to.*

It is suggested that you seek advice of counsel *in the event that you are sought to be questioned against your will.*

/s/ Patricia Ann MacPhail
1/27/64

(R–34, 1) (Emphasis added)

■ This statement is no prohibition against speech. It is no more than a fair statement that the witness is free to do whatever the witness wants to do. Based upon the PCR record thus supplemented, this Court has no hesitation in denying relief to petitioner on allegation (A). The findings of fact of the PCR court, as thus corroborated, negate the allegation that petitioner was obstructed by the state in gaining access to the witnesses he sought to interview.

■ (B) Petitioner next claims that the failure of the trial court to *sua sponte* order a competency hearing deprived him of due process. It is beyond peradventure that to bring a legally incompetent defendant to trial would violate due process. *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Bishop v. United States*, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956); *State v. Spivey*, 65 N.J. 21, 319 A.2d 461 (1974); *State v. Auld*, 2 N.J. 426, 67 A.2d 175 (1949). Thus when a *bona fide* doubt is raised as to a defendant's competency to stand trial, the court must conduct a hearing to resolve the issues. *Drope v. Missouri, supra; Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *State v. Spivey, supra.* The test of competency to stand trial is that enunciated in *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960):

[whether a defendant] . . . has sufficient present ability to consult with his lawyer with a reasonable de-

gree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.

The appreciation of the evidence evincing a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competency to stand trial are among the factors upon which a trial court can rely in its determination whether further judicial inquiry is required.

> There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts.

*Drope v. Missouri*, 420 U.S. 162, 180, 95 S.Ct. 896, 908, 43 L.Ed.2d 103 (1975).

■ Examination of the incidents which petitioner relies upon to establish the failure of the state trial courts to safeguard Trantino's due process right not to be tried while incompetent reveals circumstances which do not rise to the level of creating a *bona fide* doubt of petitioner's competence. The obligation of a court to initiate an inquiry into a defendant's competency accrues upon its observation of occurrences which, when contemplated collectively generate a real, substantial and legitimate doubt as to the mental competency of a defendant to meaningfully comprehend, participate and cooperate with his counsel during the proceedings. *Bruce v. Estelle*, 483 F.2d 1031, 1043 (5th Cir. 1973); *United States v. Vowteras*, 500 F.2d 1210 (2nd Cir. 1974).

The landmark cases of *Pate* and *Drope* illustrate the indicia of competency which should trigger a competency inquiry. In *Pate*, the trial court was exposed to evidence that the defendant had been committed to a mental hospital for eight months, had experienced delusions and loss of memory, had previously slain his infant son, had repeatedly committed or threatened acts of violence on other persons, and other instances of bizzare and irrational behavior. Additional evidence concerning the defendant's mental condition was offered but excluded. His attorney stated during trial that his client was incapable of standing trial.

In *Drope v. Missouri, supra,* the trial was exposed to evidence that the defendant had previously attempted to choke his wife to death, subjected her to bizzare abuse and indignation, and assisted four men in forcibly raping her, the crime with which he was charged. On the second day of trial the defendant shot himself, which occasioned the trial to continue without his presence. This defendant's counsel also moved for a continuance of the trial date "for the reason that the defendant is not a person of sound mind and should have a further psychiatric examination before the case should be forced to trial." The allegations pressed upon this Court are simply not of the same stuff, and they are not coupled with any claim that petitioner was incompetent to stand trial. Indeed, he could not, for the record belies any such assertion. There can be no doubt that petitioner was in fact competent to stand trial under the *Dusky* standard.

On November 13, 1963, petitioner's counsel made a motion to have psychiatrists appointed to study the defendant, for, *inter alia,* the purpose of determining his competency to stand trial. Two psychiatrists were thereafter appointed, Drs. Latimer and Kesselman. In addition, two state psychiatrists examined Trantino, Drs. Collins and Zigarelli. The psychiatric examinations spanned the entire pretrial period, taking place on September 26, 1963 (Dr. Collins); October 17, 1963 (Dr. Zigarelli); December 1, 1963 (Dr. Kesselman), and December 5, 1963 (Dr. Latimer). Each psychiatrist found petitioner to be competent to stand trial, and stated as much in his report. (R–34 at 3–5, 8–13, 14–20; R–42 at 5) Drs. Kesselman and Collins testified at trial to the same effect. (7 T 825–842, 914)

 Although the jail records indicate that petitioner met frequently with his counsel during the entire pretrial and trial periods, counsel never raised the issue of competency, or asserted to the court that he could not communicate with his client. He was clearly satisfied from his own observations and from the psychiatric reports of Latimer and Kesselman that Trantino was in fact competent to stand trial. In the face of all this, there was simply no reason for the court to raise the question on its own.[3]

In addition, all courts considering these issues have stressed the importance of the observations of demeanor made by the trial judge. In this instance the same judge conducted the PCR hearing, and specifically commented upon his recollections of the alert and capable demeanor of Trantino on the witness stand at trial. (PCR 485–487)

Finally, this Court itself has carefully perused the testimony given by petitioner at trial. (6 T) While the record is, so to speak, cold, the level of organization,

articulation and intelligence demonstrated by petitioner is striking. There simply can be no doubt, in view of all of the foregoing, that petitioner was competent. Because this is the case, relief must be denied.

In (C), petitioner claims that the administration of drugs to him altered his mental faculties and demeanor, rendering him incapable of properly defending himself. This allegation is closely tied up with that of (B), and in essence presents the same complaint.

Soon after his arrival at Bergen County Jail on September 25, 1963, Trantino complained of chronic headaches to the jail physician, Dr. Sarla, who prescribed aspirin to relieve petitioner's tension headaches. (R–34, 30) Relator's further complaints of headaches and backaches resulted in Dr. Sarla prescribing Equanil, a mild tranquilizer, twice a day on October 7, 1963, to alleviate the discomfort of the recurrent tension headaches. (R–34, 31; PCR 272)

On October 15, 1963, petitioner, irritated by a jail employee's verbal abuses (4

---

3. Although the matter was only indirectly set forth in his papers, the trial judge conducted what was in essence a hearing as to competency to stand trial at the PCR hearing. The Court of Appeals for this Circuit has recently validated the determination of competency *nunc pro tunc* under certain circumstances. *United States ex rel. McGough v. Hewitt,* 528 F.2d 339 (3rd Cir. 1975). In doing so, that Court joined many other Courts of Appeals which permit such determinations to be made. *See, e. g., United States ex rel. Suggs v. LaVallee,* 523 F.2d 539 (2nd Cir. 1975); *Carroll v. Beto,* 421 F.2d 1065 (5th Cir. 1970); *United States v. Makris,* 483 F.2d 1082 (5th Cir. 1973), *decision on remand, United States v. Makris,* 398 F.Supp. 507 (S.D.Tex.1975); *Conner v. Wingo,* 429 F.2d 630 (6th Cir. 1970); *Rose v. United States,* 513 F.2d 1251 (8th Cir. 1975); *Sieling v. Eyman,* 478 F.2d 211 (9th Cir. 1973); *Barefield v. State of New Mexico,* 434 F.2d 307 (10th Cir. 1970). As the Court of Appeals suggested in *McGough,* such determinations are permissible

. . . when the findings at the post conviction hearing were based on evidence derived from knowledge contemporaneous to the trial. . . . [where,] in addition to evaluating testimony based on contemporaneous knowledge, the trial judge will be able

to base his findings on his own impressions gathered from petitioner's appearance and demeanor at the trial [5½ years ago].

*United States ex rel. McGough v. Hewitt, supra,* at 344.

The PCR hearing in the instant case conformed to the strictures suggested above. The record at the PCR included the testimony of Drs. Zigarelli and Collins, and the PCR exhibits included Dr. Latimer's report. The trial judge conducted the hearing personally. The psychiatrist who testified for the defense, Dr. Fink, had never examined Trantino (PCR 174a); and further operated on the assumption that Trantino took two Thorazine tablets in addition to the Equanil on the day of his testimony, a factual hypothesis explicitly rejected by the trier of facts. (*See, supra* ). While the PCR judge failed to articulate a definite standard, his findings clearly subsumed the *Dusky* definition of competency. *Cf. LaVallee v. Delle Rose,* 410 U.S. 690, 93 S.Ct. 1203, 35 L.Ed.2d 637 (1973); *United States ex rel. Hayward v. Johnson,* 508 F.2d 322, 329 (3rd Cir. 1975). As to his findings of fact, they are clearly supported by the record within the meaning of *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) and Title 28 United States Code, § 2254(d).

PT 4–5), erupted into the vocal tirade "yelling at the top of his head that he was being treated like an animal." (PCR 273)

Dr. Zigarelli, a neuropsychiatrist on the staff of Graystone Park State Hospital, examined petitioner on October 17, 1963 at the behest of the prosecutor. Later that same day, Sarla telephonically sought Zigarelli's advice as to which medication would be suitable to alleviate Trantino's headache complaints. Zigarelli recommended 50 mg. of Thorazine, four times a day. (PCR 273–274, R–34, 32) The Thorazine dosage offered to Trantino was increased to 100 mg. four times daily on October 24, 1963. (R–34, 32)

On December 20, 1963, Dr. Dornich, the assistant jail physician, ordered petitioner's Thorazine medication stopped, and substituted Compazine spanules. (PCR 281) Dr. Sarla replaced petitioner's Compazine medication with Equanil tablets three times a day on December 23, 1963. Petitioner was offered, *but did not always accept,* Equanil four times a day during the interval of January 31, 1964 to February 19, 1964. (R–34, 33) Petitioner's trial encompassed the time period from February 3, 1964 to February 18, 1964.

The administration of tranquilizing medication, specifically Equanil, Thorazine and Compazine, during petitioner's incarceration by the Bergen County Jail physician is not disputed here, nor was it at the state post-conviction relief hearing. (Respondent's brief, p. 205)

Petitioner, however, does dispute the effect of these medications upon his demeanor at trial and his mental faculties during the pretrial and trial periods. Relator, in essence, is attempting to relitigate the issue of competency implicitly decided adversely to him in the state post-conviction relief hearing. The state trial court heard extensive expert testimony as to the effect of Thorazine and Equanil upon an individual and his ability to mentally function in a normal manner.

Recognition of the more potent properties of Thorazine as compared to Equanil directed the state trial court's attention towards petitioner's claim that he secretively obtained Thorazine tablets from another jail inmate on the day of his testimony. (PCR 478) It found that Trantino did not obtain the medication on the day of his trial testimony. Relying on the testimony of the two inmates which Trantino claimed could have provided him with the unauthorized Thorazine, the state court found that petitioner had not surreptitiously obtained the two Thorazine tablets on the day that he took the stand in his own defense. (PCR 478–480) This finding of fact is fully supported by the record. (PCR 73–74, 431–433, 455–456; R–38)

The state trial court found that Trantino did ingest Equanil tablets on the day of his trial testimony, one at 6:15 A.M. and another at 8:00 A.M. on February 14, 1963. (PCR 16, 484) It, however, found that this medication, Equanil, was a mild tranquilizer that would not effect the ability of Trantino to conduct his defense or to testify. (PCR 484) In reaching this finding the trial court discounted the testimony of petitioner's medical expert, Dr. Maximillian Fink, for a variety of reasons. (PCR 482) Fink's testimony was based upon the premise that Trantino was ingesting both Equanil and Thorazine during the October 17–December 20, 1963 period (PCR 199) and that petitioner took all prescribed doses of medication offered him. (PCR 151–152, 200)

Dr. Joseph F. Zigarelli, the state's medical expert, basing his opinion on his personal observation and previous examination of Trantino, and the course of medication which Trantino ingested at the Bergen County Jail, testified that Trantino's mental faculties were unimpeded by the medication on February 14, 1963. (PCR 312–314) The state court did credit Dr. Zigarelli's testimony that Thorazine in average doses would have no cumulative effect (PCR 308), and that Equanil in therapeutic doses would have

no cumulative effect on an individual (PCR 306) and would not alter memory or ability to express oneself (PCR 307–308). Dr. Zigarelli opined that, if Trantino had taken all prescribed doses of medicine, there would be no effect on his mental ability to testify on February 14, 1964. (PCR 313)

The state record clearly demonstrates that petitioner was not affected to his detriment by his voluntary ingestion of medication during his trial or during the pretrial period when his trial counsel consulted with him. During this pretrial period, when Thorazine was offered to petitioner, his refusal of this medication often exceeded his acceptance. (R–35, Oct. 17 to Dec. 20, 1963) During the two months preceding trial, petitioner received only Equanil, a mild tranquilizer, and even this he often refused. (R–35, Dec. 25, 1963 to Feb. 18, 1964) And as the state judge commented at the PCR hearing, his own recollections of Trantino's demeanor preclude the assertion that the Equanil dosage adversely affected petitioner's demeanor before the jury.

■■■ The facts of the case thus clearly distinguish it from such cases as *Sanders v. United States,* 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963); *State v. Maryott,* 6 Wash.App. 96, 492 P.2d 239 (1971), and *State v. Murphy,* 56 Wash.2d 761, 355 P.2d 323 (1960). The factual pattern in the instant case is much closer to that in *United States ex rel. Stukes v. Shovlin,* 329 F.Supp. 911 (E.D.Pa.1971), aff'd, 464 F.2d 1211, 1212–1213 (3rd Cir. 1972). Here the drugs were not forced upon petitioner. They did not render him incompetent to stand trial. They did not impair his demeanor before the jury. Relief must therefore be denied. The drugs he received, in part at his own behest, never against his will, did not prevent petitioner from receiving a fair trial. *Cf. Government of Virgin Islands v. Crowe,* 391 F.Supp. 987, 988–989 (D.V.I.1975) (citing cases).

■■■ D. Similarly, petitioner's *Brady* claim does not stand examination. Here there was no question but that petitioner

was competent. He surely knew then what he asserts now was withheld from his defense team, *i. e.,* the fact that he took certain tranquilizing drugs. Such information could hardly be said to have been suppressed from the defense by the prosecution.

(E) Petitioner next alleges that the trial court's jury charge on the issue of voluntary intoxication, as an affirmative defense, was erroneous, confusing and inadequate, depriving petitioner of his principle defense and violating his right to due process.

At trial, petitioner presented evidence to support his claim of lack of capacity to formulate the specific intent to commit murder in the first degree due to his voluntary ingestion of dexadrine pills and alcohol on the day of the crime. (7 T 875–878; 8 T 988–989).

The central allegation which petitioner espouses is that the trial court's charge regarding intoxication gave the jury "the clear impression that it was the defendant's burden to produce sufficient evidence to prove lack of capacity [b]y shifting the State's burden" on proving capacity to formulate a specific intent to commit murder beyond a reasonable doubt to the defense. (Petitioner's brief at 65)

Petitioner has isolated two sections of the trial court's charge to support his allegation. This Court's consideration of the issues is guided by the Supreme Court's admonition concerning review of selected passages of a jury charge:

> . . . ., we accept at the outset the well-established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge. *Boyd v. United States,* 271 U.S. 104, 107 [46 S.Ct. 442, 443, 70 L.Ed. 857] (1926). While this does not mean that an instruction by itself may never rise to the level of constitutional error, see *Cool v. United States,* 409 U.S. 100 [93 S.Ct. 354, 34 L.Ed.2d 335] (1972), it does recognize that a judgment of conviction is commonly the culmination of a trial which includes

testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge. Thus not only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction.

*Cupp v. Naughten,* 414 U.S. 141, 146–147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973).

An examination of the trial court charge in its entirety reveals that the jury was instructed twice that the burden was on the state to prove each and every element of the offense beyond a reasonable doubt (8 T 1036, 1044), and the trial court specifically reiterated that the state had the burden to prove premeditation, deliberation and willfulness beyond a reasonable doubt, and that immediately following the instructions concerning the defense of voluntary intoxication (8 T 1060), the trial court also supplemented its initial charge by utilizing several of the defendant's requests to charge on the issue of intoxication. (8 T 1071–1072)

█ The repeated instructions of the trial court, that the state must bear the burden to prove every element of the charged crime, including capacity to formulate specific intent, beyond a reasonable doubt, clearly conveyed the proper legal standards to the jury. The isolated passages of the jury charge upon which petitioner speculates prejudicial jury confusion do not infect the entire trial so that his conviction violates due process. The jury was clearly instructed that each element, including the formulation of specific intent, had to be proven beyond a reasonable doubt. No violation of the rule in *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) occurred in this instance. This ground for relief must be denied.

█ Finally, the petitioner alleges in paragraph (F) of his petition that the nature and extent of pre-trial publicity denied him his right to a fair and impartial trial. He bases this allegation on the asserted failure of the trial judge to take appropriate curative measures. We find this allegation to be without merit, and hold that petitioner received the fair and impartial trial by jury to which he was constitutionally entitled.

The disarming, then disrobing and finally the executing of two helpless police officers is an event that would generate intense publicity in the news media of any community, urban or rural. Such press coverage is inevitable, particularly where as here suspects were promptly identified but not immediately apprehended. The necessity of taking measures to guard petitioner's rights to a fair and impartial trial was recognized by the trial judge. The measures he took were beyond those than usually taken. Indeed they largely anticipated those recommended some four years later by the ABA standards relating to *"Fair Trial and Free Press,"* §§ 3.4, 3.5 (Approved Draft 1968), and still not yet universally applied. No constitutional error vitiated petitioner's rights.

Two major tools were utilized by the trial court to minimize any prejudicial effects of the pretrial publicity. *See,* ABA *Standards, supra,* § 3.2. First, he granted several continuances of the trial date, an action whose efficacy is clearly reflected in the visible decline of press interest until the commencement of trial itself. The trial, originally set for December 1963, was postponed upon motion of the defense until January 6, 1964, and upon further motion by the defense until February 6, 1964. (N.T. at 117; 6 PT at 26–27) The petitioner's own exhibits in 2 PT reflect the success of the trial judge's strategy in granting the defense motions for continuance. By the time of the commencement of trial, the media reporting of the case had been largely dormant for a period of well over a month.[4] While the trial itself re-awak-

4. Exhibit 2 PT is petitioner's collection of newspaper articles related to the case. Upon

close perusal it is apparent that the publicity proceeded in a clearly defined manner. There

ened media interest, it is clear that the liberal continuances, which delayed the trial over five months from the commission of the offense, materially lessened whatever impact may have been occasioned by the extensive early coverage of the crime.

The second major tool available in advance of jury selection is the motion for a change of venue. Petitioner, by his counsel Albert Gross, moved for a change of venue (or for trial by foreign jury) on November 6, 1963. (R–23, 25) On November 14, 1963, Gross withdrew the motion. (6 PT at 24–26) *His basis for doing so was his expressed belief that petitioner could obtain a fair trial in Bergen County.* (*Id.* at 24–25) In the face of this explicit waiver by experienced trial counsel, it is difficult for a federal court ten years later to find a constitutional error in the reliance by state court on that waiver and proceeding to trial in Bergen County.[5]

The third mode used by the trial court was the selection of the petit jury. The

procedures utilized during the selection of the jury were worked out to the satisfaction of the defendant at a conference between all counsel and the judge. (8 PT; IVD at 2–3) By the procedures followed, each member of the jury panel had his or her *voir dire* examination conducted in isolation, both from the panel at large and from those already selected for service. After selection and swearing of each accepted juror, he or she was immediately sequestered. The jurors not selected were returned to a different jury panel without further contact with the initial group.

The *voir dire* itself lasted five days, was conducted by counsel, and the transcripts reveal that the judge granted considerable latitude to examining counsel. *Compare United States v. Wooton,* 518 F.2d 943 (3rd Cir. 1975). Of the 115 examined members of the jury panel, some 20 candidly expressed a belief in petitioner's guilt and were excused. The 14 jurors chosen for service all swore that they were free of prejudice to petitioner's case. The court awarded 20 per-

---

was an initial peak at the time of the offense and manhunt, which was clearly the most intense period of media interest. See, 2 PT at 4–26. These articles cover, roughly, the period from August 27 through September 1, 1963. A second, much diminished peak of interest was reached during extradition proceedings, in early September, culminating in Trantino's return to Bergen County. (2 PT, 27–31) Certain pretrial matters were covered, much less extensively, from mid-October to mid-November 1963, as demonstrated at 2 PT 32–36. Publicity interest apparently was nonexistent from this point through December and most of January (with the exception of the pulp magazines, which surely reached a minimal audience of potential jurors, if they reached any at all [2 PT 1–4]), until it rose once again at the time of the actual trial in February 1964. (2 PT 37–50) The Court notes that reporting of the trial itself was largely factual in nature and in any event did not reach the sequestered jury. The articles submitted in some measure are not in accord with the present ABA standards vis-a-vis statements by officials with regard to Trantino's criminal record and statements of prospective witnesses. But they fail even to approach the level of prejudice demonstrated in *Sheppard v. Maxwell,* 384 U.S. 333, 338–349, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). *Cf. Irvin v. Dowd,* 366 U.S. 717, 725–727, 81

S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Rideau v. Louisiana,* 373 U.S. 723, 724, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). Electronic media were barred from the courtroom. (8 PT 4–5)

5. Petitioner testified in 1967 and apparently maintains now that the decision to withdraw his motion for a change of venue was made without consulting him. (PCR 216–217; Brief for Petitioner, at 81) His attorney, Albert Gross, called as his own witness in the 1967 hearing, stated on direct that petitioner was consulted and authorized him to withdraw the motion. (PCR 216–217) The 1967 PCR testimony of petitioner is inconsistent with his testimony in 1966 before Judge Wortendyke on the first federal habeas corpus petition. At that time petitioner stated that he did recall being consulted about the decision to withdraw the motion, but that he gave no instruction to his lawyers:

"That I could recall. I don't think I would give a lawyer instructions."

(H.C. at 41–43)

Although no explicit finding of fact was made below by the PCR judge, a judgment on the credibility of Trantino's claim may fairly be said to be implicit in his rejection of the motion; a finding which this Court sees no reason to disturb.

emptory challenges to the defendant. After hearing the answers of the prospective jurors, only 13 of these 20 available peremptory challenges were utilized by the defense before an acceptable jury was impaneled. Our review of the *voir dire* proceedings of those jurors selected for service reveals no hostility to petitioner suggesting a partiality which could not be set aside for the solemn task of jury service.

It is clear that a trial may be rendered unfair by the untrammelled effects of prejudicial pretrial publicity, as Judge Gibbons has demonstrated in *United States ex rel. Doggett v. Yeager,* 472 F.2d 229, 234–235 (3rd Cir. 1973); *reaff'd in principle, United States ex rel. Greene v. State of New Jersey,* 519 F.2d 1356, 1357 (3rd Cir. 1975). But where adequate prophylactic measures are taken, and where the *voir dire* reveals no hostility that could not be laid aside, a conviction will not be reversed solely because of prior jury exposure to prejudicial news media accounts. As the Supreme Court stated in *Murphy v. Florida,* 421 U.S. 794, 799–800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975):

> The constitutional standard of fairness requires that a defendant have "a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd, supra,* 366 U.S., at 722 [81 S.Ct. at 1642]. Qualified jurors need not, however, be totally ignorant of the facts and issues involved.
>
> > "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.,* at 723 [81 S.Ct. at 1642].
>
> At the same time, the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate "the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." *Ibid.*

In *Murphy,* the Supreme Court stressed that the ratio of those excused for bias to the entire panel was a key factor in determining whether any impartial jury could be selected. Twenty of the seventy-eight panel members there expressed their belief that they were biased, and the ratio was considered acceptable. *Murphy v. Florida, supra,* at 803, 95 S.Ct. 2031. Here, of course, the ratio was even more favorable to the defendant. More than this, the defendant saw and heard the jurors as they answered. While having the ability to peremptorily challenge yet another seven, he expressed himself content with all. He may not be heard to say differently now. This ground for relief must be denied.

For the foregoing reasons, petitioner's petition for a Writ of Habeas Corpus must be denied on the merits as to those grounds upon which he has exhausted his state remedies, and dismissed for failure to exhaust as to the remaining claims.